# United States Court of Appeals
## For the First Circuit

Nos. 13-1531, 13-1665,
     13-1705, 13-1714

AMERICAN STEEL ERECTORS, INC.; AJAX CONSTRUCTION COMPANY, INC.;
   AMERICAN AERIAL SERVICES, INC.; BEDFORD IRONWORKS, INC.;
              AND D.F.M. INDUSTRIES, INC.,

            Plaintiffs-Appellants/Cross-Appellees,

     RONALD BEAUREGARD, D/B/A INDEPENDENT WELDING SERVICES
                    INDUSTRIES, INC.,

                     Plaintiffs,

                         v.

   LOCAL UNION NO. 7, INTERNATIONAL ASSOCIATION OF BRIDGE,
    STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS,

           Defendant-Appellee/Cross-Appellant,

   CHARLES WRIGHT; STEEL ERECTION AND ORNAMENTAL IRON INDUSTRY
                    ADVANCEMENT FUND,

                     Defendants.

            APPEALS FROM THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS

      [Hon. Richard G. Stearns, U.S. District Judge]

                         Before

               Howard, Chief Judge,
          Stahl and Lipez, Circuit Judges.

      Michael E. Avakian, with whom Wimberly, Lawson & Avakian,
Thomas M. Triplett, Schwabe Williamson & Wyatt, Geoffrey R. Bok,

and Stoneman, Chandler & Miller LLP were on brief, for appellants/cross-appellees.

Indira Talwani, with whom Paul F. Kelly, Jasper Groner, and Segal Roitman, LLP were on brief, for appellee/cross-appellant.

Maurice Baskin and Littler Mendelson, PC on brief for Associated Builders and Contractors, Inc., amicus curiae in support of appellants/cross-appellees.

––––––––––––––––––––

February 25, 2016

––––––––––––––––––––

**HOWARD**, **Chief Judge**.    On December 2, 2004, five structural steel contractors filed a complaint against a local union alleging antitrust law violations under the Sherman Act, labor law violations under the Labor Management Relations Act ("LMRA"), and other violations under state law.    Over the intervening decade, the case has evolved in complex ways.    Although we reviewed this matter once before, Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers ("ASE I"), 536 F.3d 68 (1st Cir. 2008), we found elements pertaining to the federal claims undeveloped and remanded for further proceedings.    The case now reaches us again following trial, with both parties appealing and cross-appealing aspects of the final judgment.    After considerable reflection, and for the reasons set forth below, we affirm.

## I.    Background

### A.    Factual History

As we explained in ASE I, the structural steel industry is comprised of steel fabricators, who manufacture steel products to meet design specifications, and steel erectors, who assemble the fabricated steel.    When a developer or owner taps a general contractor to lead the construction of a building, that general contractor typically solicits bids for a combined "fab and erect"

package, which is submitted by the fabricator and includes the combined price for both the fabrication and erection of the structural steel. As such, the steel fabricators must themselves solicit bids for the erection work from the steel erectors in order to finalize their combined bid price. And, in turn, the erection companies must incorporate the significant costs associated with paying their laborers into their own steel erection price.

In New England, at the time of the complaint, there were relatively few fabricators (around twenty) and many erectors (over 200). The plaintiffs in this case are five nonunionized steel erector companies,[1] and the defendant is Labor Union No. 7 of the International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers ("Local 7"), a teamsters local union for member iron workers (including steel erector laborers) in eastern Massachusetts. Local 7 has a collective bargaining agreement ("CBA") with the Building Trades Employers' Association of Boston and Eastern Massachusetts ("BTEA"), which is an entity that represents hundreds of construction companies. Among the "union

---

[1] The plaintiffs are Arial Services, Inc., D.F.M. Industries, Inc., American Steel Erectors, Inc., Bedford Ironworks, Inc., and Ajax Construction, Inc. As plaintiffs D.F.M. Industries and Ajax Construction are most heavily involved in the foundational facts, we refer to them throughout as "DFM" and "Ajax" for ease.

signatory" firms that have agreed to the CBA are numerous erector companies with whom the plaintiffs compete.

Under the CBA, the signatory erectors must pay Local 7 workers a union scale wage. Nonunion erectors, on the other hand, are not bound to the CBA and can negotiate their own labor costs with their employees. Because labor expenditures account for approximately half of the total steel erection costs, nonunion erectors are often able to submit lower bids for erection contracts to fabricators looking to formulate a combined "fab and erect" bid. Over time, not unexpectedly, that can lead to nonunion erectors and laborers gaining market share from union erectors and laborers.

In order to prevent such erosion in its labor market share, Local 7 incorporated a "Market Recovery Program" ("MRP") into its 2000-2006 CBA. Under the MRP, signatory erectors withheld a fraction of each union laborer's paycheck, which was then paid into a target fund (the "Fund") operated by Local 7. Local 7 could then identify construction projects likely to draw competition from nonunion erectors and, on a case-by-case basis, send "blast faxes" or "project alerts" to its signatory union erectors with an offer to subsidize their bids and make them more competitive with nonunion bids. In the event that a union signatory won the

subcontract, Local 7 (sometimes in conjunction with other regional unions) would enter into a job targeting fund agreement with that erector company governing the terms of the MRP subsidy for that specific project ("JTF agreement").

### B.    Procedural History

In 2004, the plaintiffs filed a complaint in federal district court in Massachusetts alleging, in addition to state law claims, that actions of Local 7 violated both (1) the LMRA, which provides civil liability for damages resulting from unfair labor practices, 29 U.S.C. §§ 158, 187; and (2) Sections 1 and 2 of the Sherman Act, which forbid practices that unlawfully impair competition, 15 U.S.C. §§ 1, 2.  In general, the complaint alleged that Local 7 employed coercion and unlawful economic pressure to ensure that contracts were awarded to signatory erectors, rather than plaintiffs, and to foreclose nonunion erectors from a large portion of the structural steel erection market in the greater Boston area.

After the district court granted Local 7's request for summary judgment on all claims, we reversed in part.  See ASE I, 536 F.3d at 76-85.  We agreed that the plaintiffs' state claims were preempted, but remanded the surviving federal labor and antitrust claims for further proceedings.  The district court set

the plaintiffs' LMRA claims for trial and reserved the antitrust claims to be addressed after several of the factual disputes underlying both claims had been resolved by the jury.

At trial on the LMRA claims, the court limited the plaintiffs to presenting evidence about union conduct relating to four particular construction projects: two, referred to as Cardi's Furniture and Archstone Apartments, involved plaintiff Ajax; the other two projects, Fox 25 and Brickworks, involved plaintiff DFM. The jury found for the plaintiffs on each of the four projects, awarding Ajax $211,956.00 in damages and awarding DFM $78,757.60. The district court denied Local 7's motion for judgment as a matter of law or a new trial, see Fed. R. Civ. P. 50(b), 59, which challenged the sufficiency of the evidence supporting liability and the damages calculations.

Following the jury verdict, the district court relied on the evidence presented at trial in its subsequent consideration of the antitrust issues, as the plaintiffs had represented earlier in the litigation that identical evidence undergirded both the LMRA claims and the antitrust claims. Ultimately, the court entered judgment on the Sherman Act claims in favor of Local 7, concluding that the plaintiffs' evidence failed to give rise to antitrust liability as a matter of law. See Am. Steel Erectors, Inc. v.

- 7 -

Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers ("ASE II"), 932 F. Supp. 2d 240, 252 (D. Mass. 2013).

## II.  Analysis

The plaintiffs appeal from the summary judgment decision on their antitrust claims.  Local 7 cross-appeals the court's decision to keep in place the jury's verdict on the LMRA claims. We address the appeals in reverse order, review the merits de novo, and consider all trial evidence in the light most favorable to the plaintiffs.  See Long v. Fairbank Reconstruction Corp., 701 F.3d 1, 3 (1st Cir. 2012).

### A.    Labor Law Claims

#### 1. Liability

The LMRA extends a private right of action to those injured in business or property by reason of certain unlawful union practices proscribed by the National Labor Relations Act ("NLRA"). See 29 U.S.C. § 187.  As we explained in ASE I, § 8(b)(4)(ii) of the NLRA makes it an unfair labor practice for a union to threaten, coerce, or restrain an employer with an object of forcing the employer (A) to enter into an agreement prohibited by § 8(e) of the NLRA, or (B) to cease doing business with another party.  See 29 U.S.C. § 158(b)(4)(ii)(A) & (B); Intercity Maint. Co. v. Local

254, Serv. Employees Int'l Union, 241 F.3d 82, 87 (1st Cir. 2001).

An illegal § 8(e) agreement is, in turn, defined in relevant part as an agreement by an employer to cease doing business with any other person. See 29 U.S.C. § 158(e). In other words, a union may incur liability under subparagraph B of § 8(b)(4)(ii) if it coerces an employer to cease doing business with another party or under subparagraph A of § 8(b)(4)(ii) if it coerces an employer to enter into an agreement to cease doing business with another party.

Such an agreement can be express or implied, ASE I, 536 F.3d at 83, and it need not be of a "generalized exclusionary nature to fall afoul of § 8(e); rather, the use of coercive measures by a union to pressure a single neutral employer into a single agreement to cease doing business with a single non-union employer, or the application of such measures on a project-by-project basis" is sufficient to find liability. Id. (citing N.L.R.B. v. Bangor Bldg. Trades Council, 278 F.2d 287, 289–90 (1st Cir. 1960)).

Of course, Local 7 rightfully points out that a neutral employer's mere decision to acquiesce to a union's unlawful coercion and cut ties with the nonunion party is not, standing alone, sufficient to imply the existence of a § 8(e) agreement and incur liability under subparagraph A. Such an interpretation would

- 9 -

allow subparagraph B to swallow subparagraph A whole.  Local 7 points to the decision of the National Labor Relations Board ("NLRB") in Local Freight Drivers Local 208, 224 N.L.R.B. 1116 (1976), for support.

In Local Freight Drivers, the NLRB held that the union had violated subparagraph B by making the termination of its unlawful picketing contingent upon the neutral party's decision to sever its relationship with a nonunion employer.  See 224 N.L.R.B. at 1121.  The NLRB stopped short, however, of finding a subparagraph A violation, noting that the union had "specifically made removal of the [nonunion] . . . the quid pro quo for cessation of the picketing," and that "[n]o other requirement was attributed to [the union] as a condition for cessation of the picketing." Id. at 1123.  Because the union did not go one step further and require that the nonunion employer be replaced with a union employer, the NLRB found that the factual elements required for subparagraph A liability were absent from the record.  See id. at 1121-23.

In ASE I, we deemed any subparagraph B claims waived due to the plaintiffs' failure to "sort out their allegations and develop their arguments sufficiently."  536 F.3d at 83.  On remand, we offered the plaintiffs an opportunity to flesh out "the nature

- 10 -

and extent of Local 7's allegedly coercive tactics" and show that "Local 7 through use of those tactics pressured <u>neutral employers</u> into <u>agreements</u> to refrain from using non-union contractors in violation of § 8(e)."  <u>Id.</u> at 84 (emphasis added).

The permissible grounds for liability were narrowed even further at trial by jury instructions that required the plaintiffs to show that Local 7 "threatened, coerced, or restrained one or more of <u>the steel fabricators</u>" with an object of "obtaining . . . an agreement, explicit or implicit, from <u>the steel fabricators</u> to cease doing business with the plaintiffs." (emphasis added). Although subparagraph A liability might well have been premised on coercion directed at other neutral employers, such as site owners or general contractors, the plaintiffs failed to object to the jury instructions below.  With this somewhat whittled basis for liability in mind, we examine the record to ensure that a sufficient evidentiary foundation exists to prove the allegations.

Although we must ensure that the judgment rests upon more than conjecture and speculation or a mere scintilla of evidence, <u>see</u> <u>Trigano</u> v. <u>Bain & Co., Inc.</u>, 380 F.3d 22, 28-29 (1st Cir. 2004), we are mindful that it is not our role to assess witness credibility, resolve evidentiary conflicts, or weigh the evidence, <u>see</u> <u>Gibson</u> v. <u>City of Cranston</u>, 37 F.3d 731, 735 (1st

- 11 -

Cir. 1994).  In the end, we are compelled to honor the jury's verdict unless the facts and inferences point so strongly and overwhelmingly in favor of Local 7 that a reasonable jury could not have returned the verdict for plaintiffs DFM and Ajax.  See Long, 701 F.3d at 3.

At trial, DFM president Glen Pisani described how union members regularly filmed job sites where his company's laborers were working and formed picket lines ostensibly protesting DFM's pay scale as being out of step with prevailing wage standards. Pisani testified that he understood that unions might engage in this conduct lawfully in order to place pressure on erectors to sign a CBA.  At one point, Pisani made efforts to determine whether his workforce wanted to unionize, and they did not.  Even after this, however, members of Local 7 would show up at work sites and, in his words, "harass" his crew.  He found it "kind of ironic" that the union picketed publicly funded job sites that were governed by state-regulated pay scales.

Pisani further described that occasionally he hired a union crane laborer to work at a particular job alongside his nonunionized workforce, but the pressure of union picketers would provoke the crane operator to leave the site in order to avoid being "blackballed" by the union.  Union picketing intensified

when Pisani's company secured erector jobs closer to Boston: "I want to work in the city. Every time I get close, I get picketed and they make problems for me."

The president of Ajax, Donald Morel, also described union picketing at his company's job sites. He further testified about an incident in July 2003 in which about "fifty union iron workers stormed" one of his job sites in downtown Boston at 85 New Market Street, threatening Ajax laborers as not "belong[ing] in downtown." Fights broke out and property was damaged, but no one was ever held responsible for the incident. As of the time of trial, Ajax had not worked in downtown Boston since that incident.

At times, the developing hostilities in the erector labor market ensnared neutral steel fabricators. John Paulding of Cape & Island Steel, a fabricator company, testified that Local 7 had pressured him on several occasions to award bids to union signatories, rather than to nonunion erector companies. He described his first meeting with Eddie Wright, a former president of Local 7, in the early 1990s after Paulding had awarded a job to a nonunion company. Wright "let [him] know [that] the project needed to go union," and Paulding responded that he "couldn't afford" to carry the "additional costs." After pressure from Wright and the general contractor, Paulding retained a union

signatory for the job. Still, Paulding continued to use nonunionized laborers at future job sites while also continuing to feel the heat from Local 7 representatives who at times threatened to picket in order to "stop the job."

In 2003, Paulding again was approached by Local 7 representatives, who told him that they "wanted a lot of work for their people" and that "there [were] opportunities out there with target money." They explained that target money would be provided to the union "installers . . . to give them a leg up on the job" and that "it would ultimately . . . help [Paulding's company] win work." "[I]t actually never quite worked like that," Paulding explained, "it was sort of a mystery to me, the target fund money, because it was always promised how much it could do for me, but it never really did a thing for me." Paulding continued to resist the union's pressure but acknowledged that there came a time when his company only hired union signatories for all erector work in Boston except for smaller jobs lasting only one or two days.

Another steel fabricator, Ann Gavin of FAMM Steel, also testified about pressure to subcontract with union signatories that her company experienced, more directly from owners and general contractors. Gavin testified that there were several instances in which the general contractor or owner would require her to replace

the nonunion erector at the site with a union signatory. She testified, "[M]ost of them were Stop & Sho[p] [supermarkets], . . . depending upon what happened with the union, they would change their mind." "We would put the nonunion erector on notice, because in some cases they had mobilized cranes and . . . were at the site and had done the initial work in the field before the union erector came on board. So we had to get costs for them. We couldn't just cancel them and walk away." Gavin estimated that the same pattern occurred "[p]robably half a dozen [times] . . . if we're talking just about Stop & Shops." She acknowledged her company's participation in deciding "to make a change" and cancel a subcontract commitment due to "pressure or . . . an incentive being offered"; "[i]t was an abuse. It was unethical what we did."

This general gloss informed more particular evidence and testimony that was submitted with respect to four job sites where fabricators cancelled subcontracts with DFM and Ajax during project kickoff and replaced them with union signatories despite a higher subcontract cost. We review events surrounding these projects in chronological order.

### Cardi's Furniture

In the spring of 2002, plaintiff Ajax pursued erector work on a project in Attleboro, Massachusetts for a commercial

building, Cardi's Furniture, and was awarded the job by fabricator FAMM Steel. Having in hand a $370,000 purchase order for twelve weeks of erector work, Ajax began the normal kickoff preparations. Ultimately, however it was prevented from ever being able to start the work.

During kickoff, Gavin of FAMM Steel received some "initial calls," advising her that "there were issues occurring at the site"--"something was up with the union." The general contractor relayed to her that he and the owner now were "considering going from open shop to union." When Ajax learned of the trouble, Morel contacted Gavin "pretty much pleading with them not to remove us." Gavin told him that "it was beyond her control" and that he "could call Mr. Cardi himself." Morel also spoke with the owner on two occasions, to no avail: in the midst of project kickoff, Gavin chose to cancel FAMM Steel's subcontract with Ajax "to put a union erector on" the site. FAMM Steel replaced Ajax with Griffin Ironworks, a union signatory erector, at a higher subcontract price. Gavin acknowledged that "[i]t wasn't the first time" that this occurred with Morel's company and she had been "forced to change erectors."

Several entities, including three local union chapters and Local 7, paid Griffin Ironworks $120,000 in "target money" for

the Cardi's Furniture job in order to reduce the $570,000 replacement bid to $450,000--still a significantly higher cost than the Ajax subcontract. Griffin Ironworks began work in the fall of 2002 and, after fifty percent completion, sent a letter to Local 7 to request an installment of the promised payment. The December 2002 letter opens with the following, "Through a concerted effort with the New England District Council and Griffin Ironworks, Cardi's new furniture store was turned around from a nonunion project to a union project."

Fox 25

The following year, in 2003, plaintiff DFM sought work at a job site in Dedham, Massachusetts. It submitted a quote to fabricator Cape & Island Steel for the second construction phase at a Fox 25 television facility, because the erector company that "had done the job wasn't going to be there to finish it." DFM and Cape & Island Steel agreed to a purchase order of $18,000 for the erector work for a new side entrance of the building. Trouble with Local 7 soon began.

Within days of DFM laborers arriving on site, a Local 7 business representative, Wright, "had words" with DFM laborers, "questioning [them] being on the site" and upset that the fabricator had brought DFM onto the job. Wright also spoke with

- 17 -

Paulding of Cape & Island Steel "about getting [DFM] off the site" and "had conversations" with the general contractor. At some point Wright called Paulding, "extremely upset that the project was subcontracted by C&I Steel, Inc. to DFM," telling Paulding that the job "was going union." Paulding responded that his company had solicited separate bids from both union and nonunion firms, that Wright was unreasonable to expect continued negotiations with unionized erectors, and that DFM had "a reasonable price and a schedule that would work." For the fabricator, "the schedule was tight . . . we needed to get things rolling." Wright's ire escalated. He told Paulding that DFM was "one of the companies targeted by the Local 7 union," that "DFM should not be on this project," and that "there will be a strike at Fox 25." He also warned Paulding that the union had put other companies out of business before and that he planned to follow suit by "letting the gorilla out of the cage" on both Cape & Island Steel and DFM.

The conversation continued. Paulding reminded Wright that his fabricator company had provided "millions of dollars in revenue for union forces through the calendar year of 2002" and "hoped [for] some consideration for this effort." Wright, nonetheless, strenuously insisted that "the union erectors had been hurt as a result of [Cape & Island Steel's] subcontracting to

DFM" which was "a big mistake."  The discussion ended with Wright telling Paulding that "DFM [had] been targeted by the union," that the Fox 25 job "is a high-profile project," and that DFM's "non-union forces should not be there"--he assured Paulding that "Local 7 would be striking this site continuously."

When Cape & Island Steel nevertheless "went forward with DFM," union picketers arrived, causing the general contractor to contact the fabricator about the union difficulties at the job site.  DFM was asked to leave "until things got straightened out." The nonunion laborers did so but later returned to work and found that DFM's equipment and material had been damaged.  Pisani wrote a letter to the fabricator, stating that DFM had been targeted even though his employees were not interested in joining the union, vandalism had occurred at the site, and his crew's safety needed to be protected.  Receiving assurances, DFM laborers returned to work.

Later, however, the fabricator sent Pisani a fax with the following cover:  "Union BS from 'Edwin Wright' that I guess we must live with."  The attached document summarized the phone call exchange between Paulding and Wright.  The fabricator dismissed DFM from the job and retained an erector company that was considered friendly with the union.  The replacement erector,

however, worked at the site for only one week before Paulding "called DFM back, hat in hand," because the new erector could not meet the site needs. DFM returned and finished the job.

### Archstone Apartments

That summer, plaintiff Ajax pursued erector work on the Archstone Apartments project in Watertown, Massachusetts. It was a "medium-sized," multi-phase project, expected to generate about eight weeks of erector work. Following the bidding process, Ajax was awarded a $160,000 erector subcontract in June by fabricator Mandate Erectors & Steel. Ajax's project manager attended the usual kickoff meetings, sequencing the job site but, again, Ajax was never able to begin the erector work.

In early September, Local 7 sent out a "project alert" on the Archstone Apartments project, and Morel of Ajax soon learned from Ajax personnel of "a problem" with the union and that his company was "going to lose the job." After Morel had already "earmarked the crane for the job and the people," he urged the fabricator "to try and get the owner to stay with our contract." His effort failed; the fabricator broke the subcontract and hired a union signatory erector as a replacement.

Brickworks

The following year, in the winter of 2004, plaintiff DFM pursued erector work at a condominium construction project called Brickworks in Cambridge, Massachusetts, at the site of an old brick factory.  DFM was awarded the job by fabricator Capone Iron, an $80,050 subcontract for five to six weeks of labor to begin in November 2004.  During kickoff, DFM personnel met with the general contractor to ensure that safety expectations, among other things, were satisfied.  With the anticipation of union picketing, a "two-gate system" was planned so that DFM laborers would enter the site by a designated gate where the union could lawfully picket, and other trade laborers would use a separate access gate.

In mid-November, however, DFM received from the fabricator a packet of correspondence involving union efforts to obtain the erector work at Brickworks.  One document was a handwritten proposal from Bel-Lin Corporation, a union signatory, showing a total bid of $115,200 for the Brickworks erector work. The note reflected an original pricing of $136,000, reduced by some $21,000--cast as a "good guy discount."  A second document was a letter from Wright of Local 7 addressed to fabricator Capone Iron, indicating that "Walter Belmonte [of union signatory Bel-Lin Corporation] will cut $9,000" and Local 7 will use $12,000 in

target money for a total of $21,000 as "concession and market recovery." The union letter requested that the fabricator send the offer to the general contractor. The last item in the packet that the fabricator provided to DFM was a note from the project manager of Capone Iron addressed to the general contractor, stating: "Please see the attached documents from Local 7 Agent Edwin Wright, run this up the flag pole and see who salutes it."

Ultimately, DFM did not begin the erector work because the fabricator dismissed DFM from the job to give the erector work to the selected union signatory. The December 3 dismissal letter stated in part, "[A]s advised during our recent telephone conversations and due to last-minute lobbying efforts by [Local 7,] Columbia Construction Company, the General Contractor, has demanded that Union forces install the steel for the Brickworks project." Citing the "for convenience" provision in the contract, the fabricator's letter cancelled DFM's installation order, stating: "We regret taking this action considering our long-term relationship. Unfortunately, we have no other choice but to proceed with this project utilizing a union subcontractor."

The fabricator acknowledged that DFM "did [not] do anything at all" to cause Capone to cancel the contract. Less than a week later, Capone Iron entered into a subcontract for

$109,200 with Bel-Lin Corporation to perform the erector work for the project. Capone testified that it did not "make commercial sense" to take a higher bid, but that the increased cost was paid by the general contractor.

Despite the narrow prism of liability available to the plaintiffs as a result of our holding in ASE I and the district court's jury instructions, we have viewed the record as a whole and hold that there was sufficient evidence to justify the jury's findings. After the plaintiffs entered into a subcontract with each fabricator at each site, Local 7 targeted the mid-size to larger project in order to seize the work from the prominent nonunion erectors. While Local 7 had pressured fabricators before, on these four occasions the fabricators responded (albeit reluctantly) to the site troubles by agreeing to cancel Ajax's and DFM's subcontracts and to hire replacement union signatories. None of the fabricators took this action for otherwise legitimate business reasons, such as saving money or saving the job site from deficient or untimely performance by Ajax or DFM. In fact, the replacement subcontracts cost more than the cancelled ones, sometimes significantly so. And, on each occasion, the fabricator took the counterintuitive action almost immediately after the union had stirred up trouble on the site, and in the midst of

kickoff, when any potential work delays threaten to be a particularly expensive proposition. The jury rationally could have seen these circumstances as signifying a tacit agreement, attributable to the coercion itself, between each fabricator and Local 7 for a specific course of action: oust the targeted nonunion erector <u>and</u> hire a union signatory replacement for the benefit of Local 7 in order to vitiate union obstacles that had been causing project interference. See <u>N.L.R.B.</u> v. <u>Int'l Broth. of Teamsters, Local 251</u>, 691 F.3d 49, 57 (1st Cir. 2012) (determining whether an arrangement comprises an illegal § 8(e) agreement through a "holistic" inquiry into all surrounding circumstances).

Local 7 protests this reading of the record and contends that it was the general contractors or owners, rather than Local 7, who sought and secured agreements with each fabricator to cease doing business with either Ajax or DFM at the four construction projects. No doubt there is evidence in the record that would also support a jury finding that the fabricators principally acted at the behest of the site owners and general contractors. And perhaps we, sitting as a factfinder in the first instance, might have come to the same conclusion that Local 7 implores us to arrive at on appeal. But that is not our job.

Here, the evidence is quite sufficient to infer that Local 7 took a multi-pronged approach and applied pressure at multiple points to achieve the maximum intended effect. The fact that direct evidence may show that pressure was applied to one party does not somehow negate circumstantial evidence that shows that pressure was applied to another party. The task of weighing these pressures and considering whether these facts, in the aggregate, satisfied the jury instructions provided by the court falls within the province of the jury, and we will only upset that determination if no reasonable jury could have arrived at the same conclusion.

Moreover, this Court's repeated and unwavering pronouncements of respect for a jury's credibility findings and rational inferences are not merely appellate flourishes or rote recitation. The jury was entitled to rely upon industry context, witness credibility, and other subtle cues in order to feel out the true pulse of the case; a pulse that is oftentimes difficult for this Court to detect through a cold stack of transcripts. Testimonial references to "troubles," "issues," or "problems" do not arise in a vacuum and may be considered within the broader record, which is sufficient to show Local 7's exploitation of the

"time-is-money" pressures present during kickoff and the interruption (or threatened interruption) of worksite activity.

Finally, we think the evidence is more than clear that the pressure applied, and the agreements obtained, went well beyond merely unseating the nonunion fabricator. The jury was well within reason, based on the record, to find that the replacement erector's union affiliation was not just a happy coincidence but rather a necessary condition to mollify Local 7's demands.

Evidence about the lawfulness of union conduct, especially at a common situs for primary and secondary employers, often "will be conflicting and confused, and the inferences to be drawn susceptible of more than one interpretation," the selection of which is left to the factfinder. Abreen Corp. v. Laborers' Int'l Union, 709 F.2d 748, 755 (1st Cir. 1983). It is the jury's role to decide among competing, reasonable interpretations of the evidence, and the record here allowed the path it took by a preponderance of the evidence.

With Local 7's LMRA liability left in place,[2] we turn to the damages award.

---

[2] We reject a number of both parties' subsidiary challenges. First, we reject Local 7's evidentiary challenges to the record. Local 7 first takes issue with Morel's brief testimony about union

- 26 -

workers storming the construction site at 85 New Market Street in July 2003, as irrelevant and highly prejudicial. See Fed. R. Evid. 404(b). We see no abuse of discretion where the July 2003 event was close in time to the Archstone Apartments project and provided context for the hostilities between the union and Ajax during the relevant time period. Moreover, the event was explored briefly on redirect, perhaps in response to a possible misimpression left by defense counsel's cross-examination of Morel regarding an unsuccessful NLRB charge against the union. The issue of unfair prejudice is largely left to the district court, and we see no abuse of discretion given that union intent was a highly contested issue at trial.

Local 7's generic challenges to evidence of labor disputes, including primary lawful picketing and secondary labor activity, likewise fail. Despite the court's pretrial ruling allowing some measure of "background" evidence, Local 7 points to no trial objection in which it challenged testimony as out of bounds. Additionally, the jury received instructions on the difference between legal primary and illegal secondary union conduct, and Local 7 gives us no reason to conclude that the jury was inattentive to the careful line drawing it was called upon to do. See Connolly v. Roden, 752 F.3d 505, 515 n.14 (1st Cir. 2014).

Next, we reject the plaintiffs' allegations that the district court improperly foreclosed evidence at the LMRA trial of eleven other construction sites and that the district court abused its discretion in excluding four witnesses. The district court properly excluded information regarding the additional eleven job sites based on insufficient evidence that Local 7 engaged in threats, restraints, or coercion on any of these sites. The district court also properly exercised its discretion to exclude four witnesses that it deemed to be inadequately disclosed by the plaintiffs. The witnesses were not included in the plaintiffs' Rule 26 statement and were only referred to on a handful of occasions within a voluminous record. Although the plaintiffs contend that an amended Rule 26 statement is not necessary when additional information has "otherwise been made known to the other parties during the discovery process," Fed. R. Civ. P. 26(e)(1)(A), the "mere mention of a name in a deposition or interrogatory is insufficient to satisfy Rule 26(a)(1)(A)(i)," especially where, as here, the case involves an expansive record and a multitude of

## 2. Damages

The jury awarded Ajax $211,956.00 and DFM $78,757.60, the precise amounts requested by plaintiffs' counsel. Local 7 contends that the damages award is excessive and unwarranted by the evidence for two reasons. First, it argues that two-thirds of the award is based on what it calls a "lost man hours" theory, which amounts to a factual fiction in this case. Second, Local 7 argues that the damages award amounts to a double recovery because the plaintiffs were awarded their ordinary lost profits for the job sites, as well as "lost man hours" costs which also included a profit margin in the hourly wages calculus. Rather than a new trial on damages as urged below, Local 7 seeks remittitur here. Assuming that remittitur is available in the context of this appeal, we conclude that Local 7 fails to show sufficient cause for disturbing the jury's damages award.

Great deference is accorded a jury's award of damages, and the district court's decision to abide by the award is reviewed for abuse of discretion. See Loan Modification Group, Inc. v. Reed, 694 F.3d 145, 154 (1st Cir. 2012); Rodríguez-García v. Miranda-Marín, 610 F.3d 756, 765 (1st Cir. 2010). "[T]he jury is

individuals, see, e.g., Lujan v. Cabana Mgmt., Inc., 284 F.R.D. 50, 72 (E.D.N.Y. 2012).

free to select the highest figures for which there is adequate evidentiary support," Reed, 694 F.3d at 154 (internal quotation marks omitted), as long as the figure remains in the "universe of acceptable awards," Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1162 (1st Cir. 1996). In the end, we will not disturb a jury's damages award unless it is "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." Reed, 694 F.3d at 154 (internal quotation marks omitted).

The district court instructed the jury that it may award compensatory damages, meaning "lost profits, both actual and reasonably anticipated but for the effect of the boycott, and any uncompensated out-of-pocket expenses a plaintiff incurred because of the defendant's wrongful contact." It admonished the jury not to speculate or otherwise guess when deciding damages but to use common sense and deduce from the evidence an award that "fairly and reasonably compensate[s] a plaintiff for the full extent of its losses," without "understat[ing] [or] exceed[ing] compensation for the entire injury." The court further explained that "a plaintiff has a continuing duty to mitigate his damages by seeking out suitable substitute replacement work where there is the opportunity to do so." Ultimately, the jury awarded the plaintiffs

both ordinary lost profits and damages associated with "additional manpower costs" for keeping the displaced workforce employed.

The portion of the awards first deemed excessive by Local 7 amounts to $89,600 for Ajax and $45,760 for DFM. According to Local 7, because the plaintiffs elected to put their displaced laborers to work at alternative job sites, they continued to receive an economic benefit from their labor force, leaving their costs theory unsubstantiated on the record. This argument assumes that the displaced laborers must have been actually idle in order for each company to have experienced tangible financial losses aside from lost profits. It also assumes that the evidence compelled a finding that the plaintiffs' ousted workforce generated profits at the alternative site where they were reassigned. Local 7, however, both misunderstands the nature of the "additional manpower costs" requested and unduly restricts the impact of the evidence presented.

Steel erector companies often schedule several jobs simultaneously and in immediate succession in order to prevent their labor force from becoming idle. The evidence allowed a reasonable inference that any alternative work sites where the plaintiffs' displaced crews were reassigned already had fixed profit returns under a fixed subcontract. The jury could have

- 30 -

concluded rationally that readily securing true replacement erector work in the steel market for the plaintiffs' displaced erector workforce was nearly impossible on short notice, and that keeping the individuals employed meant carrying the costs of their wages, as well as taking on costs of other business inefficiencies in a time-is-money industry, without the benefit of any additional income. See Kerry Coal Co. v. United Mine Workers, 637 F.2d 957, 966 (3d Cir. 1981) (evidence showing "a reasonable basis" for a causal relationship between damages requested and the union's unlawful conduct is all that is required to sustain the damages award). Accordingly, we cannot say on this record that the plaintiffs' estimation of "additional manpower costs" during the time related to the cancelled subcontracts generated grossly excessive damages.

In making their double recovery argument, Local 7 points to the profit margin built into the hourly wage calculus used for the costs theory. Assuming, without deciding, that this issue is preserved for appellate review, Local 7's brief argument again fails.

While the record shows the possibility of some overlap, it does not necessarily demonstrate that a double recovery was incorporated in the hourly wage calculus beyond actual wages paid.

Not only did the plaintiffs pay the base wages for the displaced laborers, but Pisani testified about the "scrambling" that was required after the sudden loss of a significant erector subcontract. The jury reasonably could have inferred that both companies faced similar circumstances common to the industry and that the costs attributable to these business inefficiencies were absorbed by both plaintiffs here and were thus recoverable as costs beyond actual wages paid to the reassigned workers. Cf. Landstrom v. Chauffers, Teamsters, Warehousemen and Helpers Local No. 65, 476 F.2d 1189, 1195 (2d Cir. 1973) (remanding for new trial on damages where "[t]he most that was shown is a lost gross profit, but not a loss of net income"). Also, Local 7 makes no effort to reckon with the evidence, from which plaintiffs' counsel argued to the jury, that the financial hit taken by DFM and Ajax reduced in some measure reasonably expected future profits by diminishing their ability to reinvest in their companies for competitive growth.

After reviewing the record, we conclude that the district court did not abuse its discretion in upholding the LMRA damages award as a fair estimate of compensable harm. Thus, in addition to the LMRA liability verdict, the damages awards withstand Local 7's appellate challenges.

### B.    Antitrust Law Claims

The district court entered summary judgment for Local 7 on the plaintiffs' antitrust claims, concluding that the plaintiffs' evidence failed to give rise to antitrust liability as a matter of law.  The plaintiffs now appeal this determination. Because the plaintiffs' claim bobs at the crosscurrents of antitrust liability and labor rights, we must carefully navigate conflicting statutory directives and cut a course as close to congressional intent as we can.

The Sherman Act protects against unlawful impairments to competition, not to individual competitors.  See Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990); Sterling Merch., Inc. v. Nestle, S.A., 656 F.3d 112, 121 (1st Cir. 2011). If a party drives down the cost of its products in the hopes of pummeling a less-efficient competitor into submission, we do not permit the competitor to reach for relief through an antitrust claim.  Doing so would thwart the very purposes of the antitrust laws:  encouraging efficiency, lowering costs, and increasing output.  As such, claims under the Sherman Act require care because overly interventionist enforcement could backfire and dampen the competitive spirit that the laws were intended to foster and protect.

Here, the plaintiffs allege violations of Section 1 and Section 2 of the Sherman Act.  Section 1 of the Act prohibits unreasonable restraints of trade or commerce through contracts, combinations, or conspiracies; it thus applies only to concerted action that unreasonably restrains trade.  15 U.S.C. § 1; see Am. Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 189-90 (2010). Section 2 forbids monopolization, attempted monopolization, and conspiracies to monopolize any part of trade or commerce.  15 U.S.C. § 2.  The latter "covers both concerted and independent action" which "monopolizes" or "threatens actual monopolization"--"a category that is narrower than restraint of trade."  Am. Needle, 560 U.S. at 190 (internal quotation marks and brackets omitted).

In evaluating such claims under the Sherman Act, one of the first considerations a court faces is determining the appropriate framework for its review:  per se, "quick look," or rule of reason.  Admittedly, this decision requires putting the cart before the horse to some extent, since the court must engage with the functional and factual contents of the claim in order to decide how it will proceed to evaluate that claim.

Under Section 1, for example, "certain kinds of agreements will so often prove so harmful to competition and so

rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular circumstances. An agreement of such a kind is unlawful per se." NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 133 (1998) (internal citations omitted). When faced with an agreement of this rare species, such as a horizontal price-fixing or a market-division agreement, see id., plaintiffs can demonstrate Section 1 liability "without need for proof of power, intent or impact," Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 61 (1st Cir. 2004). See Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007) (noting that only those restraints "that would always or almost always tend to restrict competition and decrease output," or those with "manifestly anticompetitive effects and [that] lack any redeeming virtue," may be deemed per se illegal (internal quotation marks and ellipses omitted)).

If the agreement in question does not quite fit the bill of per se liability, but nonetheless would seem to have an anticompetitive effect on customers and markets to "an observer with even a mere rudimentary understanding of economics," F.T.C. v. Actavis, Inc., 133 S. Ct. 2223, 2237 (2013) (internal quotation marks omitted), the district court might opt to take a "quick look"

- 35 -

at preliminary evidence. Under this purgatorial standard, the agreement is not subject to immediate per se condemnation and may yet ascend to a full rule-of-reason review. "[Q]uick-look analysis in effect" shifts to "a defendant the burden to show empirical evidence of procompetitive effects." Cal. Dental Ass'n v. F.T.C., 526 U.S. 756, 775 n.12 (1999). Such a preliminary evaluation may be appropriate where the agreement seems anticompetitive at first glance, but the competitive justification offered by the defendant appears plausible or the agreement arises in a unique or unfamiliar context. See id. at 770.

The vast majority of agreements, however, need only be found to constitute a "reasonable" restraint of trade after a rule of reason analysis to avoid Section 1 liability. As the Supreme Court has made clear, "the Sherman Act's prohibition of '[e]very' agreement in 'restraint of trade,' 26 Stat. 209, as amended, 15 U.S.C. § 1, prohibits only agreements that unreasonably restrain trade." NYNEX, 525 U.S. at 133. Because all agreements "restrain trade" in some respect, Section 1 only prohibits "those classes of contracts or acts which the common law had deemed to be undue restraints of trade and those which new times and economic conditions would make unreasonable." Klor's, Inc. v. Broadway-

<u>Hale Stores, Inc.</u>, 359 U.S. 207, 211 (1959) (citing <u>Standard Oil Co. of N.J.</u> v. <u>United States</u>, 221 U.S. 1, 59-60 (1911)).

The "[r]ule of reason analysis typically requires a plaintiff to show that the defendants' actions enhanced market power--<u>i.e.</u>, the power to raise prices or exclude competition--which in turn requires some economic analysis of the relevant market." <u>Diaz Aviation Corp.</u> v. <u>Airport Aviation Servs., Inc.</u>, 716 F.3d 256, 265 (1st Cir. 2013). This demanding calculus compels an antitrust plaintiff to show, <u>inter alia</u>, "that the alleged agreement involved the exercise of power in a relevant economic market," and "that this exercise had anti-competitive consequences." <u>Stop & Shop</u>, 373 F.3d at 61. For exclusive dealing arrangements, "foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent . . . low numbers make dismissal easy." <u>Sterling Merch.</u>, 656 F.3d at 123-24 (internal quotation marks omitted).

Of course, in order to evaluate whether an agreement truly deserves the fatal <u>per se</u> label, or instead merits a more nuanced quick-look or rule-of-reason review, courts are obliged to "seek the central substance of the situation." <u>Am. Needle</u>, 560 U.S. at 191. This usually involves careful delineation of the parties' horizontal and vertical relationships. For example, the

plaintiffs here advance a "group boycott" theory of liability. Under a group boycott theory, "[a] violation of section 1 may well occur when a group of independent competing firms engage in a concerted refusal to deal with a particular supplier, customer, or competitor." Gonzalez-Maldonado v. MMM Healthcare, Inc., 693 F.3d 244, 249 (1st Cir. 2012) (citing Klor's, 359 U.S. at 212). A group boycott arrangement "sometimes [is] called [a] per se violation[]." Stop & Shop, 373 F.3d at 61. We have cautioned, however, that the "rhetoric of older group boycott cases" cannot be "taken at face value," and that any per se group boycott "label" is "minimally useful." Id. at 61, 63-64. This is because "precedent limits the per se rule in the boycott context to cases involving horizontal agreements among direct competitors." NYNEX, 525 U.S. at 135.

Horizontal restraints are "agreements between competitors at the same level of market structure," whereas vertical restraints are "combinations of persons at different levels of market structure such as manufacturers and distributors." M & H Tire Co., Inc. v. Hoosier Racing Tire Corp., 733 F.2d 973, 978 (1st Cir. 1984) (internal quotation marks omitted). For example, the vertical chain in this case runs from the laborers to the erectors, from the erectors to the fabricators,

and from the fabricators to the general contractors.  Meanwhile, the nonunion erector companies compete on the same horizontal plane as the union-signatory erector companies, with each erector company (whether union or nonunion) competing for bids against every other erector company (whether union or nonunion).

As if our framework for analysis were not convoluted enough, we are faced here with an antitrust claim lodged against a labor organization.  Because the labor laws accord specific protections and rights to unions, there are qualifications and carve-outs that must be considered before we proceed.

As we noted in ASE I, "there is an inherent tension between national antitrust policy, which seeks to maximize competition, and national labor policy, which encourages cooperation among workers to improve the conditions of employment."  536 F.3d at 76 (quoting H.A. Artists & Assocs., Inc. v. Actors' Equity Ass'n, 451 U.S. 704, 713 (1981)).  Whereas antitrust laws protect the consumer at the expense of individual market participants with a singular focus on price and output, labor laws protect the livelihood of the employee on the other end of the long chain of production and consumption.  The courts have sought to reconcile these competing directives via two labor

exemptions from the antitrust laws, one statutory and one nonstatutory.

The statutory exemption stems from the Supreme Court's attempt to harmonize the goals of the Sherman, Clayton, and Norris-LaGuardia Acts. Id. "Reading the three statutes together, the Supreme Court held that union activity is exempt from antitrust liability 'so long as [the] union acts in its self-interest and does not combine with non-labor groups.'" Id. (quoting United States v. Hutcheson, 312 U.S. 219, 232 (1941)).

Yet, this exemption, while helpful in protecting the organization of union activity itself, did not adequately encompass the need to protect legitimate collective bargaining activity from antitrust liability. This is because such activity necessarily "constitute[s] a combination between labor unions and non-labor employers." Id. at 77. In ASE I, for example, we pointed out that the CBA (and the MRP) clearly could not qualify for the statutory exemption because it represented a combination between Local 7 (labor) and the signatory contractors (non-labor). Id.

Thus, the Supreme Court has recognized "that a proper accommodation between the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring

- 40 -

free competition in business markets requires that some union-employer agreements be accorded a limited nonstatutory exemption from antitrust sanctions." Connell Const. Co. v. Plumbers & Steamfitters Local Union No. 100, 421 U.S. 616, 622 (1975). This nonstatutory exemption "shields some restraints on competition imposed through the bargaining process, where the alleged anticompetitive conduct is anchored in the collective-bargaining process, concerns only the parties to the collective bargaining relationship, and relates to wages, hours, conditions of employment, or other mandatory subjects of collective bargaining." ASE I, 536 F.3d at 77 (citing Brown v. Pro Football, Inc., 518 U.S. 231, 250 (1996)).

It is within this detailed framework that our evaluation of the plaintiffs' antitrust claims begins. We described the plaintiffs' antitrust claims in ASE I as asserting a "conspiracy between Local 7 and its signatory contractors to pressure fabricators to hire only union employers, through a combination of threats, disruptive behavior, and MRP subsidies." Id. at 74. The plaintiffs had "paint[ed] the MRP as only one part--if the central part--of a wider conspiracy between Local 7, its signatory contractors, and the general contractors and steel fabricators from which they solicit steel erection work, to shut open-shop

- 41 -

outfits such as Plaintiffs out of the steel erection market in the greater Boston area." Id. at 80. Although we ultimately held that Local 7's alleged conduct in combination with the signatory erectors was not protected by the statutory labor exemption, we remanded for further fact-finding to determine whether the nonstatutory exemption applied. Id. at 78-81. We reserved any opinion on the merits of the plaintiffs' antitrust claims. See id. at 76 n.6.

On remand, the district court resolved the antitrust issues after the jury's verdict on the LMRA claims. While ruling that the illegal § 8(e) agreements could not enjoy the protections of the nonstatutory exemption, the court concluded that summary judgment for Local 7 was still warranted. ASE II, 932 F. Supp. 2d at 247, 252. Its reasoning: the plaintiffs had "failed to demonstrate an unlawful anticompetitive effect of any aspect of Local 7's accused conduct." Id. at 252. We review this judgment de novo and may affirm on any ground made manifest in the record, untethered to the district court's rationale. See Euromodas, Inc. v. Zanella, Ltd., 368 F.3d 11, 16 (1st Cir. 2004).

Before us now, the plaintiffs argue that the court erroneously focused only on the four § 8(e) agreements, and thus failed to abide by our directive in ASE I to consider the "entirety

- 42 -

of the alleged activity" in the industry as a whole.  536 F.3d at

80.  Given a wider field of vision, they argue, the record shows

that the defendant is guilty of "conspiracies to monopolize, group

boycott, and horizontal monopoly."  We have attempted to piece

together these claims to the best of our ability given the rather

murky briefing, but we cannot find that antitrust liability exists

on the facts and theories presented.[3]

### 1.    Section 1 Group Boycott

The plaintiffs initially attempt to circumvent a typical

rule of reason analysis by incanting the magic, _per se_ words of

"group boycott."  But, the plaintiffs' attempt to twist the record

into reflecting a _per se_ violation is unavailing.  As discussed

above, "precedent limits the _per se_ rule in the boycott context to

cases involving horizontal agreements among direct competitors."

_NYNEX_, 525 U.S. at 135.  As such, plaintiffs' allegations of

questionable vertical arrangements, whether between Local 7 and

fabricators or Local 7 and general contractors, do little to

advance their claim to _per se_ treatment.  In order to potentially

generate _per se_ antitrust liability, Local 7's vertical

---

[3] To the extent the plaintiffs fault the district court for
declining to engage in a free-ranging review of the defendant's
behavior and conjure coherent claims into existence on the
plaintiffs' behalf, we certainly find no error.

- 43 -

relationships would at least need to intersect with or give rise to an unlawful horizontal relationship. Cf. MM Steel, L.P. v. JSW Steel 7 (USA) Inc., 806 F.3d 835 (5th Cir. 2015); United States v. Apple, Inc., 791 F.3d 290 (2d Cir. 2015). Here, there is no such horizontal arrangement to speak of.

To the extent the plaintiffs claim that there is any horizontal conspiracy among the fabricators as a class or the general contractors as a class to shut nonunion erectors out of bidding opportunities, there is no such evidence in the record. Despite isolated instances of nonunion erectors being removed from jobs, there was no evidence of any horizontal agreement among general contractors or among fabricators to foreclose the plaintiffs from the structural steel erection market at Local 7's request. Compare Klor's, 359 U.S. at 208-09 (holding boycott unlawful when appliance manufacturers and distributors agreed that distributors would not sell to one retailer at another retailer's request) with NYNEX, 525 U.S. at 133, 136-37 (antitrust rule that group boycotts are illegal per se did not apply to a single buyer's decision to favor "one seller over another, albeit for an improper reason" because the combination involved only a vertical agreement and a vertical restraint depriving a supplier of a potential customer).

- 44 -

To the contrary, the fabricators' testimony evinced a willingness and desire to work with the nonunion erectors, and there appeared to be no general, horizontally consistent scheme of market foreclosure. One witness described DFM and Ajax as "extremely large" and "prominent" in the steel erection industry during the pertinent time frame. Pisani started DFM in the early 1990s, and the company gained stability with about twenty-five employees, primarily working in Rhode Island and Massachusetts. By the middle of the next decade, DFM had grown to about 110-120 employees and $13 million in sales. First entering the industry in the 1970s, Ajax had varying employee numbers over time, ranging from thirty to 120. Its business territory covered much of New England, including Massachusetts, Connecticut, New Hampshire, and Rhode Island. Ajax and DFM, as well as other named plaintiffs, regularly entered into subcontracts with various fabricators.

Nor does one find any meaningful evidence of unlawful horizontal conspiracy among the signatory erector firms. To the extent the plaintiffs bemoan the operation of the MRP in conjunction with signatory erector firms, there can be little doubt that this program was part and parcel of the CBA protected from antitrust scrutiny by the nonstatutory exemption. The MRP was clearly "anchored in the collective-bargaining process,

concer[ned] only the parties to the collective bargaining relationship, and relat[ed] to wages, hours, conditions of employment, or other mandatory subjects of collective bargaining." ASE I, 536 F.3d at 77 (citing Brown, 518 U.S. at 250). As we mentioned in ASE I, such agreements, as a general matter, have been widely upheld. Id. at 79-80.

Beyond this point of wage agreement, however, the plaintiffs' accusations of horizontal conspiracy among the signatory erectors ring hollow on this record, especially in light of the rigorously enforced Section 1 demands for sufficient proof of concerted conduct. See Am. Needle, 560 U.S. at 190 n.2; Fisher v. City of Berkeley, 475 U.S. 260, 266 (1986); White v. R.M. Packer Co., 635 F.3d 571, 576 (1st Cir. 2011). While it remains true that "[o]ne group of employers may not conspire to eliminate competitors from the industry and the union is liable with the employers if it becomes a party to the conspiracy," United Mine Workers of Am. v. Pennington, 381 U.S. 657, 665-66 (1965); see also Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, 325 U.S. 797, 800 (1945), sufficient proof of concerted anti-competitive action among independent business entities remains necessary to state a successful Section 1 claim.

In the end, evidence of conduct by the union erector signatories as market participants that remains ambiguous as to whether the actors have engaged in an illegal antitrust conspiracy, as opposed to independent action or conscious parallelism, is insufficient to survive summary judgment. See White, 635 F.3d at 577 & n.5; Euromodas, 368 F.3d at 19. After careful review of the record, we conclude that the plaintiffs' evidence fails to clear this hurdle and that any purported tacit horizontal agreement among union signatory erectors remains illusory. See Euromodas, 368 F.3d at 18 (noting that antitrust plaintiffs bear the burden "to make at least a prima facie showing of concerted action" with "an illicit objective").

Beyond the bare wage agreement and operation of the MRP, which are protected from antitrust scrutiny under the nonstatutory exemption, each company acted as its own profit-maximizing entity pursuant to its own economic interest when seeking to win a fabricator's favor with the lowest erector bid, whether competing against a nonunion firm or another union signatory. Each union signatory erector formulated its own bid either with assurances of an MRP subsidy or by taking a corresponding cut in profits to account for nonunion bidders who were not bound to CBA wages. There is no evidence that the union signatories relinquished

independent, competitive decision-making when receiving blast faxes and opting to submit a bid on the projects targeted by Local 7 or when later entering into a JTF agreement with the union for a winning bid. Rather, the evidence tends to show that the hundred-plus signatory erectors remained independently profit-driven in their respective bidding decisions--with or without the promised subsidy.

This precludes us from holding that the instant case falls within a category of "what may be called a group boycott in the strongest sense: A group of competitors[, i.e., signatory erectors,] threaten[ing] to withhold business from third parties[, i.e., fabricators or general contractors,] unless those third parties would help them injure their directly competing rivals[, i.e., nonunion erectors]." NYNEX, 525 U.S. at 135; see also Fashion Originators' Guild of Am., Inc. v. F.T.C., 312 U.S. 457 (1941) (applying per se liability to an agreement among clothing designers, manufacturers, and suppliers to withhold selling clothes to retailers who bought clothes from competing manufacturers and suppliers).

Without unlawful agreement among participants at any given horizontal plane, a Section 1 claim cannot fall within the narrow category of per se unlawful group boycott agreements.

- 48 -

Because the plaintiffs failed to demonstrate any agreement among general contractors, any agreement among fabricators, or any non-wage-based agreement among signatory erectors,[4] the plaintiffs' group boycott theory of antitrust liability fails.

---

[4] The plaintiffs continue to allege that the wage-based agreement among and between the signatory erectors and Local 7 cannot be sheltered from antitrust scrutiny because it involved taking deductions from laborer wages and providing contractor subsidies on public projects in violation of the Davis-Bacon Act, 40 U.S.C. §§ 3141-3148.  See ASE I, 536 F.3d at 74; see id. n.5 (providing contours of Davis-Bacon Act).  In ASE I, we recognized that "the MRP may very well violate the Davis-Bacon Act" to the extent it draws deductions from public projects or offers subsidies to contractors to win public projects.  Id. at 81.  We also recognized, however, that the plaintiffs themselves had not pursued, and likely could not pursue, a cause of action under the Davis-Bacon Act.  Id.  We left it to the plaintiffs on remand to flesh out their theory.  In the final analysis, we do not believe that the plaintiffs have successfully landed their "acrobatic attempt to shoehorn a possible Davis-Bacon violation into their antitrust claims."  Id.

"The Davis-Bacon Act was originally enacted in 1931 as a 'minimum wage law designed for the benefit of construction workers' which 'protects . . . employees from substandard earnings by fixing a floor under wages on Government projects.'" Int'l Bhd. of Elec. Workers, Local 357, AFL-CIO v. Brock, 68 F.3d 1194, 1199 (9th Cir. 1995) (quoting United States v. Binghamton Constr. Co., 347 U.S. 171, 177-178 (1954)).  "When Congress enacted the Davis-Bacon Act, it intended to remove labor as [a] competitive element." In the Matter of: Bldg. & Constr. Trades Unions Job Targeting Programs, WAB Case No. 90-02, 1991 WL 494718, at *1 (June 13, 1991).

When an otherwise-lawful MRP is utilized on such public projects, however, the funds deducted from the Davis-Bacon projects are used "as subsidies on private sector projects," and the prevailing wage surveys might thereby become "distorted to the extent the subsidy was distributed to [a] contractor on a private

## 2.  Section 1 Vertical Restraints

This leaves us with the plaintiffs' attack on Local 7's alleged vertical arrangements with individual signatory erectors, fabricators, and general contractors.  Assuming that, from our labor analysis above, at least four vertical agreements exist, the

_____

sector project."  Id. at *6.  "Over time, the government would pay more on Davis-Bacon . . . projects than the actual area wage rate, a result clearly outside the public interest and definitely not contemplated by the Congress which enacted Davis-Bacon."  Id.

Although the recycling of wages through fixed-wage public projects and competitive private projects via the MRP may ultimately have an anticompetitive effect, this outcome is partially a result of the Davis-Bacon Act's anticompetitive prevailing wage mechanism.  In other words, the plaintiffs' frontal assault on the MRP seems to necessarily entail a collateral, predicate attack on the Davis-Bacon Act itself.

Thus, while we agree that Congress presumably did not intend to permit such deductions under the Davis-Bacon Act, we find it equally unlikely that Congress intended the Sherman Act to provide the remedy that the plaintiffs request. See ASE I, 536 F.3d at 81 (noting that "Reich and its progeny do not appear to stand for the proposition that a Davis-Bacon violation exposes an otherwise exempt job targeting program to antitrust liability").  Allowing particular deductions or subsidies that violate Davis-Bacon to eviscerate the categorical protections provided against Sherman Act liability would radically alter the careful balance struck between labor rights and antitrust liability.

That is not to say that a theory of liability more tailored to the specific offending characteristics or applications of the MRP might not allow for antitrust scrutiny.  Rather, it is simply to say that the plaintiffs' broadside attack on the nonstatutory exemption fails.  The plaintiffs have attempted to pin antitrust liability on the MRP as a whole, but we think the tail fails to find the donkey.

plaintiffs allege a wider pattern of exclusive dealing between Local 7 and fabricators or Local 7 and general contractors.

Yet, this basis for antitrust liability also fails. First, to the extent any given fabricator or contractor replaced a nonunion erector with a union erector for improper reasons and in the face of higher costs, this alone is insufficient to prevail on an antitrust claim. See NYNEX, 525 U.S. at 136-37 (noting that "[t]he freedom to switch suppliers lies close to the heart of the competitive process" and that applying per se liability to a buyer's decision to switch suppliers, even "though not made for competitive reasons, . . . would transform cases involving business behavior that is improper for various reasons . . . into treble-damages antitrust cases").

Second, any vertical agreements struck by the union are, on this record, insufficient to survive the district court's summary judgment. That is not to say that vertical agreements with exclusionary components can always escape antitrust liability. In Connell Construction, for example, a local union entered two sets of agreements: (1) a multiemployer bargaining agreement with a "most favored nation" clause that promised in essence to eliminate competition between all signatory mechanical trade subcontractors and any other subcontractors that the union

might organize, and (2) a series of parallel, vertical agreements with general contractors that prohibited the general contractor from using any subcontractor that did not have an agreement with the union. 421 U.S. at 619, 623-25. Thus, the union's agreements with general contractors not only reached beyond the laborers' primary employers, but also made nonunion subcontractors completely ineligible to compete for a substantial portion of all available work and imposed an anticompetitive restraint on the business market that was not limited to the elimination of competition over wages and working conditions. Id. at 625. Without deciding whether the union's vertical agreement with the general contractor actually violated the Sherman Act, the Supreme Court held that the agreement could provide the basis for a federal antitrust suit and remanded the case. Id. at 637.

Simply put, however, this case is no Connell. In the absence of evidence that Local 7 entered into a systemic or interlocking set of vertical exclusive dealing agreements with third-party neutrals so as to effectively foreclose the plaintiffs' access to a significant portion of competitive opportunities in the market for structural steel erection, we cannot disagree with the district court's decision to dispose of the antitrust claims on summary judgment.

To the extent Local 7 can be said to have entered into a handful of project-by-project vertical "exclusionary" agreements, the district court properly noted that such agreements are usually adjudged under the rule of reason.  See Leegin, 551 U.S. at 907; Cont'l Television v. GTE Sylvania, 433 U.S. 36, 59 (1977).  A rule of reason analysis "requires a burdensome multi-part showing: that the alleged agreement involved the exercise of power in a relevant economic market, that this exercise had anti-competitive consequences, and that those detriments outweighed efficiencies or other economic benefits."  Stop & Shop, 373 F.3d at 61.

But, generally speaking, to make out a claim of exclusive dealing under the rule of reason, the plaintiffs would need to show that they were foreclosed from competing in a substantial portion of the relevant market.  See id. at 68 ("For exclusive dealing, foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent."); ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 303 (3d Cir. 2012) (holding that parallel long-term agreements between a single, upstream supplier and all downstream purchasers that contained exceedingly high market-penetration-target rebates constituted de facto exclusive dealing agreements and were, in the aggregate, anticompetitive under the

- 53 -

rule of reason).  Based on the trial record, the district court found that spending in the relevant market "has exceeded $200,000,000 each year since 1999" and that the four opportunities foreclosed "constitute only a fraction of a percent of the defined market, nowhere near the percentage impact necessary to make out an exclusionary claim under the rule of reason."[5]  ASE II, 932 F. Supp. 2d at 248.  Rather, the district court found that the plaintiffs were not "shorn of the ability to remain as competitors in the market" and that there was "no evidence that they were excluded from bidding on other jobs."  Id. at 249.

To overcome this factual inconvenience, plaintiffs argue that the four deprivations presented at trial are illustrative of a broader pattern of exclusion from the Boston-area steel erection market, as evidenced by (1) the undisputed fact that seventy percent of the steel erection work within the geographical bounds of the agreed-upon market was performed by union signatory erectors, and (2) the trial testimony indicating that at some point nearly all significant erector work in Boston itself was performed by union signatory companies.

---

[5] The court assumed for purposes of summary judgment that spending for steel erection in the agreed-upon market exceeded $200 million each year since 1999, and the plaintiffs agree with this calculation.

Although these numbers might paint a more compelling picture if the plaintiffs could show that they were the result of widespread or systemic anticompetitive agreements or conduct, we side with the district court in finding the record lacking in this regard. Section 1 "does not reach independent decisions, even if they lead to the same anticompetitive result as an actual agreement among market actors." White, 635 F.3d at 575. "To survive [a] motion for summary judgment, [the] plaintiffs needed to demonstrate a genuine dispute as to whether defendant['s] actions caused an injury to competition, as distinguished from impact on themselves." R.W. Int'l Corp. v. Welch Food, Inc., 13 F.3d 478, 487 (1st Cir. 1994) (emphasis in original).

None of the discrete agreements involved a refusal to deal on an on-going basis, a fact that the plaintiffs acknowledged before the district court. Cf. Sterling Merch., 656 F.3d at 124 ("'Short contract terms and low switching costs generally allay most fears of injury to competition,'" as do vertical agreements that are "not entirely exclusive." (quoting 11 Areeda & Hovenkamp, Antitrust Law, ¶ 1802, at 94)). Moreover, there is insufficient evidence to establish widespread collusive agreements between Local 7 and steel fabricators or general contractors to foreclose

open-shop erector companies as a general matter. We briefly revisit the record on the latter point.

Of the twenty steel fabricators referenced at trial, only four agreed to break subcontracts with DFM and Ajax and retain a union signatory replacement at a higher cost due to the pressure imposed by Local 7. Indeed, Paulding of fabricator Cape & Island Steel testified to his resistance against union pressure, and the evidence relating to the Brickworks project also evinces fabricator opposition toward Local 7's interference. Furthermore, DFM and Ajax were not excluded from bidding on other jobs or on future jobs with the same fabricators. It is telling that fabricator Cape & Island recalled DFM to finish the erector work at the Fox 25 site, and afterward the two entities continued their business relationship. Similarly, fabricator Capone Iron continued hiring DFM after dismissing that nonunion company from the Brickworks site.

Additionally, both DFM and Ajax flourished financially during the relevant time frame, two other plaintiffs also experienced economic growth, and three of the five plaintiffs entered the steel erector market since the inception of the MRP. Pisani himself testified that in the "past couple of years [DFM had] been doing a lot of pharmaceutical companies" and was "very

competitive" on "very large jobs . . . a testament to what [his company] has done," and he agreed that as of 2006 his company "[had] been working pretty steady with about 20 fabricators."

While Local 7 certainly put direct pressure on some third-party neutrals to award work to union signatory companies, in the end (and after years of litigation and protracted discovery), the plaintiffs proved only four occasions in which individual fabricators agreed to replace a nonunion company with a union signatory erector company.

Nor is it sufficient to point to the MRP alone as evidence of an unlawful vertical agreement. Fabricators are entitled to respond to lower prices from erectors, and signatory erectors are entitled to float lower bids in an attempt to win erection work. A job lost to price competition is not one the antitrust laws were intended to restore or vindicate.[6]

---

[6] As we discuss above, there may perhaps be reason to believe that a more narrowly tailored challenge to applications of the MRP could survive summary judgment, but the plaintiffs cannot render all contracts stemming from the MRP wholly unlawful under antitrust law merely by showing that the MRP sometimes functioned unlawfully under unrelated laws. As such, the plaintiffs cannot transform a vertical agreement entered into between a union signatory and a fabricator on the basis of price into an unlawful "exclusionary" agreement simply by pointing to a secondary JTF agreement between Local 7 and that union signatory.

Moreover, the record gives other reasons for the concentration of union labor in Boston. For instance, early on in the litigation, the district court noted that "[t]he largest Boston area construction projects employing structural steel workers are government-financed public works projects, including the 'Big Dig,' the Boston Harbor clean up, and the renovation of the terminals and parking facilities at Logan Airport." At trial, both Pisani and Morel testified that they generally opted not to submit bids for publicly funded projects because they did not want to sign the required project labor agreement. In short, the record evidence does not point inevitably toward a conclusion that union labor dominance for erector work in Boston stemmed from any set of unlawfully restrictive agreements, rather than some other cause not regulated under the Sherman Act. See NYNEX, 525 U.S. at 136-37; Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 224-25 (1993); Atl. Richfield, 495 U.S. at 344; Apex Hosiery Co. v. Leader, 310 U.S. 469, 503 (1940).[7]

---

[7] It is true that Gavin of fabricator FAMM Steel testified that her company had agreed on numerous occasions to replace a nonunion erector with a union signatory at the behest of the general contractor or owner (and through union pressure), including about "half a dozen Stop & Shops." However, she is the only fabricator witness who testified to an apparent company pattern of subcontract breaches targeting nonunion erectors.

"[S]ome antitrust cases are intrinsically hopeless" because "they merely dress up in antitrust garb what is, at best, a business tort or contract violation." Stop & Shop, 373 F.3d at 69; see also E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc., 357 F.3d 1, 4 (1st Cir. 2004). Ultimately, the plaintiffs' antitrust claims here are dressed in the same vestment. And so, given the record before us, we agree with the district court's bottom line that the evidence was only sufficient to demonstrate the existence of a handful of sporadic vertical restraints resulting in harm to the plaintiffs, and not the existence of a systemic set of exclusionary restraints resulting in harm to competition in the marketplace for structural steel

---

Also, the plaintiffs offered no evidence that Gavin's company accepted higher priced contracts with union signatories beyond the Cardi's Furniture project. On this record, we should not leap to a conclusion that one fabricator's potential business torts or contract breaches are indicative of antitrust liability. See Stop & Shop, 373 F.3d at 69. This is particularly true in view of the fact that DFM, Ajax, and other willing open-shop erectors continued to participate in the fiercely competitive structural steel erection market. Cf. Sterling Merch., 656 F.3d at 124 (holding that exclusive agreements were not proven to have impaired competition where, inter alia, distributors historically competed for the agreements with retailers, plaintiff succeeded in winning over one of defendant's largest customers, other avenues of distribution remained available, and new competitors entered the market).

erection services itself.  See Stop & Shop, 373 F.3d at 66;

Euromodas, 368 F.3d at 21; R.W. Int'l, 13 F.3d at 487.

3.  Section 2

Lastly, we note that the plaintiffs have invoked Section 2 of the Sherman Act as well, although their allegations pertaining to "conspiracy to monopolize" and "horizontal monopolization" are dubious and difficult to divine.  Their brief mingles Section 1 and Section 2 advocacy, with little attention to the latter.

There is, perhaps, an argument to be made that the bids of signatory erectors on particular private projects could have been below-cost, predatory bids offset by supracompetitive prices enabled by the Davis-Bacon Act's prevailing wage mechanism and the artificial inflation of the local prevailing wage rate.  Hints of a novel theory of this nature seem to be scattered throughout the plaintiffs' papers.  Yet, once again, we are faced with a situation where the plaintiffs have provided such skimpy evidence and entangled briefing that this theory of liability must be considered waived.  See ASE I, 536 F.3d at 83 ("[I]f [p]laintiffs cannot sort out their allegations and develop their arguments sufficiently, it is not for us to do so for them.").

The plaintiffs' buckshot Davis-Bacon accusations have always seemed to suggest that the alleged violations of that

statute should unwind the nonstatutory exemption as a whole, thereby causing otherwise-lawful and non-conspiratorial activity to incur antitrust liability.  On remand, the district court addressed the MRP in the context of the plaintiffs' larger conspiracy theory, and we agree that the plaintiffs' alleged Davis-Bacon violations do not impact the MRP's broader eligibility for the nonstatutory exemption.

Beyond this, however, the plaintiffs have sporadically implied that the deductions and subsidies themselves were part of an unlawful predatory pricing scheme.  While we do not foreclose the viability of the suggested theory as a matter of law in future cases, any leeway that we may grant to parties who present evolving legal theories on appeal has limits.  See generally Genereux v. Raytheon Co., 754 F.3d 51, 59 (1st Cir. 2014); Macauley v. Anas, 321 F.3d 45, 52 (1st Cir. 2003).

The plaintiffs have exceeded those limits.  A predatory pricing claim under Section 2 requires plaintiffs to prove that the prices complained of were below an appropriate measure of costs and that there was a dangerous probability that the difference between these values could be recouped.  Brooke Group, 509 U.S. at 222, 224.

Here, the plaintiffs haphazardly invoke variant strands of antitrust case law and have failed to make any coherent argument to support their predatory pricing claim. Stop & Shop, 373 F.3d at 65 ("[S]ubstitut[ing] innuendo for analysis [is] fatal" to antitrust claims since antitrust plaintiffs must "explain in detail . . . just what the arrangements were and why they plausibly constituted antitrust violations."). The plaintiffs fail to explain at all, for example, how recoupment via the unlawful exploitation of a statutory mechanism rather than recoupment via monopolistic power would affect a predatory pricing analysis. If this unconventional approach is economically unsound, then there is a good chance that the "unsuccessful predation [would be] . . . a boon to consumers," Brooke Group, 509 U.S. at 224, and we would be wise to stay our hand, at least as far as antitrust liability is concerned. If the plaintiffs wish to cut a bold new path through antitrust law with a seemingly unique claim, they must show us the way.

Equally fatal, the plaintiffs' brief feints in this direction inexplicably fault Local 7 for failing to provide evidence of above-cost pricing. But as the district court recognized, "[t]his contention . . . stands the burden of proof on its head. Plaintiffs bear the ultimate burden of proving their

claims, and on summary judgment must identify some evidence on which a jury could reasonably find in their favor . . . . That they have not done." ASE II, 932 F. Supp. 2d at 251 n.13.[8]  We can hardly disagree.  See Brooke Group, 509 U.S. at 222 ("[A] plaintiff seeking to establish competitive injury from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs.").

Because the plaintiffs have failed to offer sufficient evidence or argument to support a predatory pricing or "monopolization" claim, we find that their Section 2 claim, like their Section 1 claims, fails.  Accordingly, the plaintiffs are left without antitrust recourse.[9]

---

[8] Insofar as the plaintiffs point to Dr. Kenneth Clarkson's expert report and argue that the MRP resulted in millions of dollars in harm due to "gross lost profits" by the plaintiffs, this continues to both presume the MRP is wholly unlawful and confuse harm to competition with harm to competitors.  More importantly, Local 7 successfully moved to preclude him from testifying at the LMRA trial, and the plaintiffs failed to reanimate and adequately support these arguments in their post-trial briefing.

[9] As with the LMRA claims, the plaintiffs gain no traction by faulting the district court for excluding evidence on the eleven other construction projects.  The court rendered these rulings in relation to the LMRA trial, and the jury's verdict has withstood Local 7's appellate attack.  The plaintiffs do not adequately tie their evidentiary challenges to their antitrust appeal, and we will not craft a connection for them.  Moreover, while they had the opportunity post-trial to readdress evidentiary boundaries for

### III.  Conclusion

We **AFFIRM** the district court's decisions upholding the LMRA jury verdict and award of damages for plaintiffs DFM and Ajax, and granting summary judgment for defendant Local 7 on the antitrust claims.  **Parties to bear their own costs.**

---

the antitrust litigation, the plaintiffs' 2011 summary judgment pleadings nearly exclusively relied on the trial evidence. Accordingly, we have no need to address the merits of their arguments.