# United States Court of Appeals
## For the First Circuit

No. 11-1947

LOAN MODIFICATION GROUP, INC.,

Plaintiff, Appellant,

v.

LISA REED,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. Magistrate Judge]

Before

Boudin, Hawkins* and Dyk,**
Circuit Judges.

Isaac H. Peres, for appellant.
Thomas J. Gleason, for appellee.

September 21, 2012

_____

   *    Of the Ninth Circuit, sitting by designation.
   **   Of the Federal Circuit, sitting by designation.

**DYK**, **Circuit Judge**.  Plaintiff-Appellant Loan Modification Group, Inc. ("LMG") appeals from a jury verdict awarding $414,000 in damages against LMG for breach of partnership duties and responsibilities owed to Defendant-Appellee, Lisa Reed ("Reed").  On appeal, LMG urges that the jury verdict should be overturned because (1) recovery on any express oral partnership agreement is barred by the Statute of Frauds; (2) any partnership agreement that arose by implication is at-will and does not support a damages award; and (3) assuming liability, the amount of the damages award is not supported by substantial evidence.  We affirm.

**I.**

Given the favorable jury verdict, we recite the facts "in the light most favorable to [Reed], giving [her] the benefit of every favorable inference that may be fairly drawn."  Dumas v. MacLean, 404 F.2d 1062, 1064 (1st Cir. 1968).

In 2008, this country was in the throes of a subprime mortgage crisis, prompting Congress to pass the Emergency Economic Stabilization Act of 2008 ("the Act"), Pub. L. No. 110-343, 122 Stat. 3765 (codified as amended at 12 U.S.C. § 5201, et seq.).  One of the primary purposes of the Act was "to immediately provide authority and facilities that the Secretary of the Treasury can use to restore liquidity and stability to the financial system of the United States" in order to "protect[] home values, college funds, retirement accounts, and life savings [and] preserve[]

-2-

homeownership." 12 U.S.C. § 5201. To further this purpose, on March 4, 2009, the Treasury Department created the Home Affordable Modification Program ("HAMP"). See U.S. Dep't of the Treasury, Home Affordable Modification Program Guidelines (Mar. 4, 2009), available at http://www.treasury.gov/press-center/press-releases/documents/modification_program_guidelines.pdf. The aim of HAMP was to assist homeowners on the verge of foreclosure to modify their loans to an affordable level. The government offered financial incentives to mortgage servicers who agreed to such modifications on behalf of the mortgage holders. HAMP was scheduled to expire at the end of 2012.[1]

In 2008, Reed was working as mortgage broker in Massachusetts. That same year she met David Zak ("Zak"), a lawyer who ran a Massachusetts-based regulatory compliance consulting practice for mortgage brokers and bankers known as Zak Law Offices ("ZLO"). In late 2008, Reed and Zak discussed the possibility of entering into a loan modification business, apparently in anticipation of the creation of HAMP. The discussions between Reed and Zak culminated in an oral agreement to enter into the loan modification business together. The planned business model was to offer assistance to homeowners who were in danger of foreclosure. An analysis would be conducted to determine whether those homeowners were good candidates for loan modification under HAMP.

---

[1] HAMP has since been extended to December 31, 2013.

If they were, the homeowners would be provided assistance in securing a modification. The homeowners would pay a fee for this service.

Under the agreement, Zak agreed to supply the initial funding for the business and Reed agreed to develop the client base from her existing client database, which consisted of subprime mortgagees (homeowners) with high interest mortgages who might benefit from loan modification. Although Reed requested a formal written agreement detailing their partnership, Zak assured her that a written agreement was not necessary.

In February 2009, Zak created LMG, a company wholly owned by Zak, as the entity that would conduct the partnership business together with Reed. The niceties of LMG's corporate existence were largely ignored during briefing, the parties treating LMG and Zak as interchangeable. When LMG and Reed began operating the loan modification business in early 2009, Reed was initially paid a "per file fee" of approximately $400 to $450 for each loan modification customer that she brought in. However, in June 2009, the payment arrangement was modified such that Reed and Zak would split the profits from the business fifty/fifty, and each would also receive a bi-weekly salary of $2,500. Additionally, once the business became profitable, at least once per month, Reed requested that Zak put their partnership agreement in writing, but was unsuccessful in obtaining a written partnership agreement.

On January 4, 2010, Zak approached Reed, told her that he no longer needed her in the loan modification business, and directed her to leave LMG's offices. Reed was then escorted out of the office by an armed police officer. On January 8, 2010, Reed, through counsel, sent a letter to LMG requesting an immediate inspection of the books and records of the partnership, a formal accounting, and her share of the profits as required under Massachusetts law. However, Reed never received the requested inspection, accounting, or profits. In short, at no time after Reed was ejected from the business in January 2010 was there any winding up of the purported partnership between Reed and LMG. Following Reed's expulsion, LMG continued to operate the loan modification business and retained all the profits.

On February 25, 2010, LMG, ZLO, and another entity filed a copyright infringement suit against Reed in the United States District Court for the District of Massachusetts, alleging that Reed unlawfully copied loan modification software created by a third party for exclusive use by LMG and ZLO. Reed filed a counterclaim, alleging, inter alia, that she had formed a partnership with LMG and that LMG breached its obligations and duties to the partnership by attempting to terminate the partnership without providing Reed with records inspection, an

accounting, or her share of the profits.[2] Reed's theory was that LMG's failure to do so meant that the partnership continued in existence, entitling Reed to damages.[3] The parties subsequently settled the copyright dispute, and the case proceeded to trial only on Reed's partnership-related counterclaims based on this theory.

On June 20, 2011, a four-day jury trial commenced. Following the presentation of several witnesses and documentary evidence, the court instructed the jury that the "[p]arties may form a partnership by oral agreement . . . or by the conduct in which the parties engaged and the relationship the parties actually created," but if a partnership is based on an oral agreement, the jury must consider the Statute of Frauds which "bars the enforcement of an oral agreement that, by the terms of the oral agreement, cannot be performed within one year." J.A. 56, 58. The court also instructed that "[u]nless the parties formed an enforceable agreement which specified the circumstances under which

_____

[2] Reed also alleged that a partnership was created with ZLO, but the jury rejected this theory at trial, and Reed does not press it on appeal.

[3] Count Five (Breach of Partnership Agreement) and Count Six (Breach of Contract) of Reed's counterclaim also alleged that LMG breached the partnership agreement, which was "intended to exist for a specific length of time in order to accomplish a particular purpose," by refusing to share the profits from the business. J.A. 29-30. These counts were based on the earlier allegations that "[t]he partnership[] [was] intended to exist for a specific length of time, until December 31, 2012, in order to accomplish a particular purpose, specifically to provide loan modifications to homeowners under [HAMP]." J.A. 27. We discuss only Reed's primary theory as presented at trial.

the partnership could be dissolved, the partnership is 'at-will' and any partner may dissolve the partnership at any time." J.A. 60. As to damages, the court stated that if the jury found the existence of an enforceable partnership and that a partner had breached the duties of that partnership, it could award Reed "her share of the profits . . . of the partnership from the date of the dissolution of the partnership until the date of the termination of the partnership or, if . . . no such termination occurred, than [sic] the present." J.A. 62. The case was then submitted to the jury.

After deliberations, the jury returned a verdict finding that Reed had formed an enforceable partnership with LMG, and that LMG had breached the duties and responsibilities of the partnership. The jury's verdict form was general, and did not specify whether the jury found the existence of a partnership based upon an oral agreement not barred by the Statute of Frauds (express partnership agreement) or based on the actions of the parties (implied partnership agreement). The jury awarded Reed $414,000 in damages based on LMG's breach. Although the damages portion of the verdict form was also general, the jury noted at the bottom of the form how the damages award had been calculated. Specifically, the jury indicated that it was awarding Reed $18,000 per month for eighteen months as "partnership profit share" ($324,000 total), and $5,000 per month for eighteen months as a "salary" ($90,000 total),

for a total award of $414,000.  The eighteen-month period on which the award was based encompassed the period of time from Reed's expulsion from LMG to trial.

Following trial, LMG moved for judgment as a matter of law, contending that any express partnership between Reed and LMG was barred by the Statute of Frauds, and any implied partnership agreement was terminable at-will and therefore could not support the jury's damages award.  The district court denied LMG's motion and entered final judgment.  LMG timely appealed.

## II.

On appeal, LMG argues that the district court erred in denying its motion for judgment as a matter of law.  We review the district court's denial of LMG's motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) de novo.  See N. Laminate Sales, Inc. v. Davis, 403 F.3d 14, 26 (1st Cir. 2005).  "The verdict must be upheld unless the facts and inferences, viewed in the light most favorable to the verdict, point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have [returned the verdict]."  Borges Colón v. Román-Abreu, 438 F.3d 1, 14 (1st Cir. 2006) (alteration in original) (quoting Acevedo-Diaz v. Aponte, 1 F.3d 62, 66 (1st Cir. 1993)) (internal quotation marks omitted).

**A.**

LMG first contends that any oral partnership agreement between Reed and LMG is barred by the Statute of Frauds as a matter of law because the partnership was designed to last for the entire four-year duration of HAMP, and agreements which are not to be performed within one year must be written in accordance with Mass. Gen. Laws ch. 259, § 1.[4]

At trial, Reed contended that the oral agreement was not for a specific duration (and that therefore there was no Statute of Frauds issue). See Coughlin v. McGrath, 4 N.E.2d 319, 323 (Mass. 1936). In particular, Reed testified that the partnership could have terminated at any time if the business was unsuccessful. To support its contention that the agreement was for a partnership of four years' duration, and was thus barred by the Statute of Frauds, LMG relied on Reed's testimony on cross-examination that the purpose of LMG's business was to perform loan modifications in accordance with HAMP, and that HAMP was supposed to last through the end of 2012 (i.e., for four years). Reed also testified that she and Zak could not walk away from the partnership in LMG unless one of them engaged in some dishonest conduct. LMG argues that

_____

[4] Mass. Gen. Laws ch. 259 § 1 provides that "No action shall be brought . . . [u]pon an agreement that is not to be performed within one year from the making thereof; [u]nless the . . . agreement upon which such action is brought . . . is in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized."

Reed's testimony brings the partnership agreement between LMG and Reed within the Massachusetts Statute of Frauds. We disagree.

Other than Reed's own statements on cross-examination, LMG presented no evidence that the partnership was of a fixed duration (indeed, Zak testified that there was no partnership at all). When pressed on this issue on cross-examination, Reed explicitly stated, "[the agreement] could have been a possibility of four years; it could have been a possibility of two years; it could have been a possibility of six or eight years." Transcript of Trial at 110, Loan Modification Grp., Inc. v. Reed, No. 10-cv-10333 (D. Mass. June 21, 2011), ECF No. 67 (emphasis added). Based on this testimony, the jury was entitled to find that the partnership here was not of a fixed duration.

Under Massachusetts law, "if an agreement whose performance would otherwise extend beyond a year may be completely performed within a year on the happening of some contingency, it is not within the statute of frauds." See Coughlin, 4 N.E.2d at 323 (quoting Carnig v. Carr, 46 N.E. 117, 118 (Mass. 1897)); see also Boothby v. Texon, Inc., 608 N.E.2d 1028, 1036 (Mass. 1993) ("Because [the plaintiff's] contract was for permanent employment, it could have been performed within one year: . . . [the defendant] could have discontinued its business, at which point its obligation to employ [the plaintiff] would end."). Given the ambiguity in Reed's testimony, the jury was entitled to find that although Reed

-10-

and LMG's partnership was formed in anticipation of and carried out in accordance with HAMP, it could be fully performed within one year and need not last for the entire four-year duration of HAMP. Thus, the jury could have reasonably rejected application of the Statute of Frauds.

**B.**

In addition to considering whether Reed and LMG had formed a partnership by express oral agreement, the jury also considered whether a partnership agreement was implied based upon "the conduct in which the parties engaged and the relationship the parties actually created." J.A. 56. On appeal, LMG does not challenge the sufficiency of the evidence to support a jury finding that there was an implied at-will partnership agreement based upon the conduct and relationship between the parties. Thus, the evidence clearly supported the jury's finding that a partnership existed, whether based on an express oral partnership agreement or on an implied partnership agreement.

Reed's primary theory at trial and in her post-trial filings was that although the partnership was dissolved, LMG never provided the accounting and profit sharing required by Massachusetts law, that the partnership continued, and that Reed was entitled to share in the profits even after the dissolution.[5]

_____

[5] Reed's theory was stated clearly in her closing argument: There was no compliance with her requests as she made

-11-

To the extent that Reed also argued that LMG wrongfully dissolved the partnership, we do not understand Reed to press that theory on appeal. Rather her theory is that Zak's conduct was wrongful even if the partnership was at will.[6]

## C.

LMG claims that an at-will partnership cannot support the jury's damages award. Although an at-will partnership can be dissolved by any partner at any time, see Meehan v. Shaughnessy, 535 N.E.2d 1255, 1260 (Mass. 1989), under Massachusetts law, the dissolution of the partnership does not end the matter. Dissolution is merely "the change in the relation of the partners

those requests pursuant to law, and the business continued; there's no doubt about that, even though she was wrongfully excluded from it, and that she's entitled to a share of the profits of the business when it continued after the time he wrongfully excluded her. He continued on with the business and refused to acknowledge her demands as a partner, so that's what we say our theory of the case is.

Transcript of Trial at 45, Loan Modification Grp., Inc. v. Reed, No. 10-cv-10333 (D. Mass. June 24, 2011), ECF No. 69. In other words, because there was no proper termination of the partnership, Reed continued as a partner and could not be excluded from sharing in the partnership profits.

[6] On appeal, Reed contends that "in order to have found the existence of a partnership, based on the evidence, it must have been under a theory of partnership by implication because all of the initial partnership discussions were with ZLO prior to the legal existence of LMG . . . There was sufficient evidence introduced at trial for the jury to conclude that although the partnership may have been terminable at-will by either party there was still a breach of the partnership agreement." Appellee's Br. at 6.

-12-

caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." Mass. Gen. Laws ch. 108A, § 29. Dissolution occurs, among other things, "[b]y the expulsion of any partner from the business," as happened here when Reed was excluded from LMG. Id. § 31(1)(d). Under Massachusetts law, upon dissolution of an at-will partnership, each partner "has the right to wind up the partnership affairs." Id. § 37. "On dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed." Id. § 30. "Winding up" is "the process that occurs during the period following dissolution and preceding termination, during the course of which work in process is completed, partnership assets are sold, creditors are paid, and the business of the partnership is brought to an orderly close." Anastos v. Sable, 819 N.E.2d 587, 592 (Mass. 2004) (quoting Adams v. United States, 218 F.3d 383, 388 (5th Cir. 2000)).

Each partner's right to "wind up" includes "the right to an account of his interest" in the partnership, Mass. Gen. Laws ch. 108A, § 43, and the right to receive the payment of "the net amount due him from the partnership," id. § 38. See Eddy v. Fogg, 78 N.E. 549, 550 (Mass. 1906) ("[A partner's] right to an accounting and settlement accrue[s] upon the dissolution of the firm."). These principles apply equally to at-will partnerships. See Murray v. Bateman, 51 N.E.2d 954, 955-56 (Mass. 1943) (former partner

-13-

entitled to an accounting upon dissolution of at-will partnership); Lawson v. Shine, 295 N.E.2d 177, 177-78 (Mass. App. Ct. 1973) (expelled partner in at-will partnership was entitled to half of the value of the partnership).

Here, Zak's own testimony indicated that, despite Reed's demands, she was never provided with an accounting of her partnership interest or a distribution of her portion of the profits, and the loan modification business continued. In essence, following dissolution, there was never any winding up of the partnership affairs as is required by Massachusetts law before a partnership can be terminated. The result was that the partnership continued through the date of trial (which was approximately eighteen months following dissolution). Under Mass. Gen. Laws ch. 108A, § 23(2), "[a] continuation of the business by the partners . . . without any settlement or liquidation of the partnership affairs, is prima facie evidence of a continuation of the partnership." See also id. § 30; Shapira v. Budish, 175 N.E. 159, 161 (Mass. 1931).

Having determined that the partnership was never wound up following Reed's expulsion, the jury could have also reasonably concluded that Reed was entitled to damages based upon LMG's post-dissolution continuation of the business, while employing assets that Reed contributed.

The Supreme Judicial Court of Massachusetts considered a situation very similar to this case in Murray v. Bateman, 51 N.E.2d

954.  In that case, four men entered into an at-will oral partnership agreement to establish and conduct a school for shipfitters.  Under the agreement, each of the four partners would receive one fourth of the profits from the school.  Shortly after the school opened, three of the partners expelled the fourth, directing him to leave the school premises.  Id. at 955.  Although the three partners told the expelled partner that the partnership was dissolved, they nonetheless continued to operate the school without him, employing the good will that he had contributed.[7]  Id. The court noted that where the partnership agreement was "for a partnership at will and any party could retire from the firm at any time he desired," the retiring partner generally "would not have any right . . . to claim damages because he was thereby deprived of sharing in the future profits of the business."  Id. at 955-56. However, the court held that, under the Uniform Partnership Act as adopted in Massachusetts,[8] "[p]rofits made by the remaining partners subsequently to dissolution, through the employment of the firm's assets, must be accounted for to the partner who had retired and has not been paid his share of the assets."  Id. at 956 (emphasis added).

---

[7]  As the court noted in Murray, "[g]ood will is generally understood to mean the advantage that accrues to a business on account of its name, location and reputation, which tends to enable it to retain the patronage of its old customers."  51 N.E.2d at 955.

[8]  Massachusetts enacted the Uniform Partnership Act in 1922.  See Tropeano v. Dorman, 441 F.3d 69, 75 (1st Cir. 2006).

The rule articulated in Murray has been similarly adopted in other jurisdictions that have enacted the Uniform Partnership Act. See, e.g., Schrempp & Salerno v. Gross, 529 N.W.2d 764, 771 (Neb. 1995) ("[A] partner [has] a continuing fiduciary duty to [the partnership] that prohibits a partner of a dissolved partnership from entering into contracts for personal gain in connection with unfinished business of the partnership."); Hamilton Co. v. Hamilton Tile Corp., 197 N.Y.S.2d 384, 386-87 (N.Y. Sup. Ct. 1960) ("Being a partnership at will, [a former partner] may have had the right to dissolve and to request a winding up of the partnership affairs; he could even then go off to another new venture, but he could not secretly become part of a venture that looks for its profits to the accounts and fruits of the former partnership still in a process[] of being wound up."); see also, e.g., Wanderski v. Nowakowski, 49 N.W.2d 139, 145 (Mich. 1951) ("[P]laintiff [under state law similar to the Uniform Partnership Act] was entitled . . . to be awarded his share of the profits arising from the continued use of partnership assets in the business  . . . from [the time of dissolution] until the entry of decree in the circuit court . . . .").

There is no question here that LMG continued the partnership business following Reed's expulsion from the partnership. The jury was also presented with substantial evidence that Reed contributed the majority, if not all, of the client base for the loan modification business. Based on that evidence, the

-16-

jury could have easily concluded that LMG utilized Reed's client database to operate its business, and that by continuing the business with the assets (customer base) that Reed contributed, LMG breached its duties and obligations to Reed. Where the partnership breaches its fiduciary duty by continuing the partnership business with partnership assets, but depriving the expelled partner of participation in the business, the expelled partner is entitled to "the net amount due him," Mass. Gen. Laws ch. 108A, § 38, from the continuing partnership. See Murray, 51 N.E.2d at 956; see also Essay v. Essay, 123 N.W.2d 20, 27 (Neb. 1963) ("[An expelled partner who] does not acquiesce in the termination of the partnership but demands a winding up of the partnership . . . is entitled to share in the profits until the partnership business has been finally terminated.").

Based on the evidence, the jury could conclude that "the net amount due" Reed was fifty percent of LMG's profits and the agreed upon $2,500 bi-weekly salary. Reed was entitled to the full amount due to her (including the salary) as long as the partnership continued regardless of whether the partnership agreement was express or implied. See Shulkin v. Shulkin, 16 N.E.2d 644, 649 (Mass. 1938) ("The right of a partner to compensation for his services depends wholly upon agreement, express or implied."); see also Boyer v. Bowles, 37 N.E.2d 489, 493 (Mass. 1941) ("[T]he subsequent course of dealing and conduct of the parties may be considered in determining whether there is such an implication in

-17-

favor of the allowance of compensation as is tantamount to an express agreement.").  As the district court instructed, having found that the partnership was never terminated and that LMG breached its fiduciary duties, the jury was free to "award Ms. Reed her share of the profits . . . of the partnership [and her salary] from the date of the dissolution of the partnership until [the date of trial]."  J.A. 62.

## D.

LMG finally contends that the jury verdict should be set aside because the amount of the jury's damages award is not supported by the evidence.  In particular, LMG apparently argues that the award of $324,000 as Reed's "partnership profit share" for the eighteen-month period is not supported by the record because Reed is only entitled to fifty percent of LMG's net income during the eighteen-month period, which was substantially less than the premise of the jury award--i.e., a total net profit of $648,000.

We review a jury's award of damages with "great deference."  Segal v. Gilbert Color Sys., Inc., 746 F.2d 78, 81 (1st Cir. 1984).  "[T]he jury is free to select the highest figures for which there is adequate evidentiary support.  And, such a verdict will be reduced or set aside only if it is shown to exceed any rational appraisal or estimate of the damages that could be based upon the evidence before the jury."  Id. (internal quotation marks and citation omitted).  Accordingly, we will not overturn the jury's damages award "unless it is 'grossly excessive,'

'inordinate,' 'shocking to the conscience of the court,' or 'so high that it would be a denial of justice to permit it to stand.'" Id. at 80-81 (quoting McDonald v. Fed. Labs., 724 F.2d 243, 246 (1st Cir. 1984)).

LMG's theory concerning the amount of net profits during the eighteen-month period is not entirely clear. LMG's apparent premise is that its gross receipts during that time were $367,384 as reflected in LMG's bank statements, and that even without accounting for any reductions for business expenses, the gross income was far less than the amount of net income assumed by the jury's damages award ($648,000).[9] In contrast, Reed's theory at trial was that LMG diverted its income to ZLO in an attempt to conceal its true post-dissolution profits. Reed pointed to the combined LMG and ZLO bank statements during the relevant eighteen-month period, which showed that the total gross income for both LMG and ZLO combined was approximately $3.5 million. There was also evidence that LMG and ZLO's combined expenses for the first three months of the eighteen-month period were on average $154,554 per month. Assuming $3.5 million in net revenue and average expenses of $154,554 per month for eighteen months, LMG's total profit during the eighteen-month period would have been approximately

---

[9] LMG also points to its profit and loss statement which showed $207,717 in net income for 2009 and $7,258 in net income for January through March, 2010. However the eighteen-month period here began in January 2010, when Reed was expelled from the partnership, and concluded in June 2011, the month of trial.

$718,000, exceeding the $648,000 assumed by the jury. Additionally, Reed presented evidence indicating that before she was ousted, the profits from the business exceeded $60,000 per month, and the business was steadily growing. As the district court concluded in rejecting LMG's motion for judgment as a matter of law, the jury was entitled to reject LMG's evidence in favor of the contrary evidence presented by Reed, and to calculate a total profit of $648,000 and Reed's profit share as $18,000 per month over the eighteen-month period.

Accordingly, we conclude that there was adequate evidentiary support to sustain the jury's damages award.

## III.

For the foregoing reasons, we find that there was no error in the jury verdict, and that the district court did not err in denying LMG's Rule 50 motion.

**Affirmed**.