NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

18-P-329                                          Appeals Court

WAYNE CHANG & another[1]  vs.  CAMERON WINKLEVOSS & others.[2]

No. 18-P-329.

Suffolk.     December 13, 2018. - April 24, 2019.

Present:  Kinder, Neyman, & Desmond, JJ.


Practice, Civil, Motion to dismiss, Motion to amend, Summary
     judgment, Costs.  Damages, Quantum meruit.  Unjust
     Enrichment.  Contract, Unjust enrichment, Termination,
     Joint venture, Rescission, Attorney.  Partnership,
     Agreement, Dissolution.  Uniform Partnership Act.  Attorney
     at Law, Malpractice, Negligence, Conflict of interest,
     Representation of differing interests.



     Civil action commenced in the Superior Court Department on
December 21, 2009.

     Motions to dismiss, filed on May 7 and 18, 2010, were heard
by Peter M. Lauriat, J., and a motion for reconsideration, filed
on May 26, 2011, was considered by him; a motion for summary
judgment, filed on April 28, 2014, was heard by Thomas P.

_____

     [1] The i2hub Organization, Inc.

     [2] Tyler Winklevoss, Divya Narendra, Howard Winklevoss,
ConnectU, Inc. (formerly known as ConnectU LLC), Scott R. Mosko,
and Finnegan, Henderson, Farabow, Garrett & Dunner LLP.  While
originally named as a defendant, ConnectU was dismissed from the
case on March 22, 2013.  The company no longer exists and is not
a party to this appeal.

Billings, J.; the entry of judgment was ordered by Edward P. Leibensperger, J., and a motion for costs was heard by him.

Alan D. Rose, Jr. (Meredith W. Doty also present) for the plaintiffs.

Matthew Murray, of California (Michael Rubin, of California, & Max D. Stern also present) for Cameron Winklevoss & others.

Erin K. Higgins (Christopher K. Sweeney also present) for Finnegan, Henderson, Farabow, Garrett & Dunner LLP, & another.

KINDER, J. In this case we examine the dismissal of contract and tort-based claims brought by software developer Wayne Chang against brothers Cameron and Tyler Winklevoss, the creators of ConnectU, Inc. (ConnectU), a social networking website that was a competitor to The Facebook, Inc. (Facebook). This action was filed following the settlement of protracted multistate litigation between Mark Zuckerberg, the founder of Facebook, and the Winklevoss brothers, Zuckerberg's pre-Facebook collaborators. Chang's complaint alleged that he was entitled to a share of the proceeds of the settlement between the Winklevoss brothers and Zuckerberg -- $65 million in cash and stock tendered by Facebook in exchange for ConnectU.

Chang's suit arises from the failed business relationship between Chang and his company, The i2hub Organization, Inc. (i2hub), the Winklevoss brothers, Divya Narendra, and Howard

Winklevoss (collectively, the Winklevoss defendants),[3] and ConnectU. Chang's complaint also included malpractice claims against Scott R. Mosko (Mosko), an attorney who previously represented Chang, and Mosko's law firm[4] (collectively, the Mosko defendants).

Chang asserted contract and tort claims against the Winklevoss defendants, claiming that they had breached at least one of two agreements entitling him to a portion of the Facebook settlement proceeds. Alternatively, Chang claimed that, in the absence of an enforceable agreement, he was entitled to recover damages through equitable claims, including quantum meruit and unjust enrichment. Chang's equitable claims were dismissed for failure to state a claim, and his remaining contract and tort claims were subsequently dismissed on summary judgment. The professional negligence claims against the Mosko defendants were also dismissed on a motion pursuant to Mass. R. Civ. P. 12 (b), 365 Mass. 754 (1974), and final judgment entered for all defendants.[5] On appeal, Chang claims error in the orders of

---

[3] For clarity, we use first names when referencing the individual Winklevosses.

[4] Finnegan, Henderson, Farabow, Garrett & Dunner LLP.

[5] After entry of the judgment and Chang's notice of appeal, a judgment for costs entered, awarding the Winklevoss defendants $30,305.53 for deposition costs. Chang filed an amended appeal, to include the costs award, but makes no argument in his brief regarding the award. The argument is therefore waived. See

dismissal and the decision on the defendants' motion for summary judgment.  We affirm, principally because we agree that the business relationship between Chang and the Winklevoss defendants ended long before the commencement of the settlement negotiations between the Winklevoss brothers and Facebook.

Background.  1.  Formation of the business relationship. We summarize the facts alleged in Chang's complaint, accepting them as true for the purpose of our review of the rule 12 (b) dismissal of the quantum meruit and unjust enrichment claims. Harrington v. Costello, 467 Mass. 720, 724 (2014).

Chang launched i2hub, a peer-to-peer, file-sharing "platform," in March 2004.  ConnectU, a social networking site in competition with Facebook, was founded by Cameron and Tyler Winklevoss.  At some point, Divya Narendra and Howard Winklevoss (Cameron and Tyler's father) also became coowners of ConnectU. Seeking to increase ConnectU's user base, Cameron and Tyler contacted Chang in October of 2004, to explore forming a business relationship.  The parties agreed to integrate i2hub software into ConnectU's social networking website, and discussed forming a jointly owned holding company, later referred to as the Winklevoss Chang Group (WCG), which would own both companies as well as other Internet-based entities that

Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019).

they would jointly develop.  The parties further agreed that, upon completion of the integration, Chang would be given the option to acquire a fifteen percent ownership interest in ConnectU.  On November 23, 2004, Cameron sent Chang a memorandum of understanding (MOU) via e-mail,[6] and Chang accepted the terms the next day by e-mail.

Over the next several months, the parties worked collaboratively, holding themselves out as partners in the development of ConnectU, i2hub, and other Internet entities. Chang and the Winklevoss defendants opened an office in Amherst run by Chang, with a small staff paid for by Cameron and Tyler. Revenue generated by i2hub and other Internet entities Chang worked on was redirected to ConnectU.  Chang also began working to integrate the i2hub software into ConnectU, and claimed he completed the integration in February, 2005.  The complaint did not indicate what, if any, compensation Chang received.

---

[6] The MOU stated, in pertinent part:

"Upon completion of the integration, CU [ConnectU] will give Wayne Chang the option to exercise a 15% stake in CU.

"This option can be exercised if and only if one of the following conditions occurs:

"1.  CU terminates its relationship with i2hub after integration

"2.  CU does not enter into a holding company with i2hub."

Beginning in April 2005, the business relationship quickly deteriorated as the parties became entangled in various financial and ownership disputes (further described infra).

2. Termination of the business relationship. We summarize the undisputed facts which relate to the Winklevoss defendants' motion for summary judgment. The business collaboration between Chang and the Winklevoss defendants was short-lived. The parties do not dispute that they never executed a written agreement to form WCG; nor is there any evidence of any agreement on the specific terms of a working partnership or holding company. Several months after the relationship commenced in the fall of 2004, it became antagonistic due to intensifying financial and ownership disputes. In April of 2005, Cameron and Tyler informed Chang that they had ceased funding him and the Amherst office. They also claimed that Chang was in debt to them for expenses in the amount of approximately $18,000 and demanded repayment or equity in i2hub.

The record contains substantial documentation in the form of e-mail messages and online discussions (instant messaging) exchanged during April and May of 2005 between Chang and the Winklevoss brothers, as well as between Chang and John Taves, a principal of a company hired to work on the integration of ConnectU and i2hub. These communications indicate that both parties sought to end their business relationship. On April 23,

2005, Chang told Taves that he had "no desire to continue to work with them" and that he was "figur[ing] out how to get funding, wash myself of the Winklevosses, and move onto the next venture." The next day, Chang further stated to Taves, "[A]ll I want is i2hub . . . [I'm] willing to take just i2hub, rather than keeping my hands in connectu." Chang reiterated this position in an e-mail to Taves on April 25, stating that his "end goal" was to retain ownership of i2hub and, on April 28, he again told Taves that he had "no wish to continue to work with them," adding that he had "already begun disintegration."

In a lengthy instant message exchange on May 25, 2005, Chang and Tyler discussed the status of their working relationship and Chang's alleged debt. Focusing on an upcoming press release concerning i2hub, Tyler told Chang to "make sure you take our names off of anything to do with i2hub." Chang responded, "[M]ake sure you remove i2hub from connectu." The conversation continued with Tyler asking, "[W]hy would you want our names on the press release if we are no longer working together?" Chang responded, "[I] don't," adding that he also did not "want i2hub associated with connectu anymore," and ended by stating that i2hub and ConnectU were "no longer working together."

Chang also expressed doubts as to whether WCG or any other holding company or partnership was ever formed. In an e-mail to

Tyler on April 23, 2005, Chang stated that WCG "was never fleshed out," that he was "sent a draft of the agreement, but nothing was done on that . . . [and that it was] something that hasn't been created."  In an instant message exchange with Taves on April 24, Chang referred to WCG as "a non-existent holding company," claiming he "never agreed to [a] holding company," and that no "merger" had occurred because he "didn't agree to the terms [Cameron and Tyler] set out."  In an e-mail to Taves on the same day, he further asserted that "the parent company was never formed."  In another e-mail to Taves in late May, he stated:  "The umbrella corporation never materialized.  So both companies have been separate, but working jointly."  In the same May 25 instant message exchange noted above, in response to Tyler's admonishing him to fulfill his agreements, Chang countered by saying, "[S]how me the agreement."  Chang further stated that until the dispute over the debt was resolved, "there is no deal in place."  He went on to explain that "there is no agreement" and, therefore, when the funding stopped, he "stopped working with connectu's interest in mind," and that there was "no reason for [him] to continue when connectu has no desire to."  Chang continued to reiterate that "theres [sic] no agreement in place."  Chang ended the exchange by stating that the financial dispute needed to be resolved before he would go

forward: "[Y]ou decide what you want to do. [I]f you want the integration to go ahead, make an offer."

Finally, while Chang claimed in his complaint that he had completed the integration, he indicated to Tyler in the May 25 instant message exchange that the integration was "never completed." He explained that he had stopped working on integration because Cameron and Tyler ceased funding him, and would continue to withhold his services until the dispute over the debt was resolved.

After May 25, 2005, there was little contact between the parties. The parties do not dispute that the Winklevoss defendants continued operating ConnectU without Chang. Likewise, Chang continued to operate i2hub until he shut it down six months later on November 14, 2005.

3. The Facebook litigation. On September 2, 2004, prior to Chang's involvement with the Winklevoss defendants, ConnectU filed an action in the United States District Court for the District of Massachusetts against Zuckerberg, Facebook, and others, asserting, inter alia, misappropriation of trade secrets. See ConnectU LLC vs. Mark Zuckerberg, No. 04-CV-11923 (D. Mass.) (Massachusetts action). Chang was not a party to the action. Almost a year later, in August 2005 (after Chang and the Winklevoss defendants had ended their business collaboration), Facebook brought an action in the California

Superior Court against ConnectU and the Winklevoss defendants alleging that one of the websites Chang had helped develop misappropriated Facebook's proprietary information and user data. The case was later removed to the United States District Court for the Northern District of California (District Court). See Facebook Inc. vs. Connect U, Inc., No. 5:07-CV-01389 (N.D. Cal.) (California action). (We refer to the Massachusetts and California actions collectively as the Facebook litigation.) Chang was eventually named as a defendant in the California action.

Facebook and ConnectU agreed to a global settlement of all pending litigation at a February 22, 2008 mediation. Pursuant to the terms of the settlement, Facebook received one hundred percent of ConnectU's stock in exchange for $20 million in cash and over one million shares of Facebook stock for a total value of approximately $65 million. Subsequent disagreement over the terms of the settlement led to further litigation. The settlement was eventually deemed enforceable, and the California and Massachusetts actions were dismissed with prejudice, including all claims against Chang in the California action. See Facebook, Inc. v. Pacific Northwest Software, Inc., 640 F.3d 1034 (9th Cir. 2011); ConnectU, Inc. vs. Facebook, Inc., No. 07-

CV-10593 (D. Mass. July 22, 2011) (order of dismissal);[7] Facebook Inc. vs. Connect U, Inc., No. 5:07-CV-01389 (N.D. Cal. Dec. 15, 2008) (order of dismissal).

Chang filed the present action on December 21, 2009, claiming that, by virtue of his fifty percent interest in WCG, he was entitled to a fifty percent share of the settlement proceeds.[8]

4. The Mosko defendants' representation of Chang. For the purpose of our review of the Mosko defendants' motion to dismiss, we again accept the facts alleged in the complaint as true. Harrington, 467 Mass. at 724. We include facts derived from documents, e-mails, and other materials referenced or relied upon in the complaint. See Harhen v. Brown, 431 Mass. 838, 839-840 (2000). We also take judicial notice of court orders pertaining to the Facebook litigation settlement. See Reliance Ins. Co. v. Boston, 71 Mass. App. Ct. 550, 555 (2008).

The Winklevoss defendants and ConnectU retained the Mosko defendants to defend them in the California action. When Chang was named as a defendant in that action, the Winklevoss brothers

---

[7] This case was a sequel to the earlier Massachusetts filing; the two cases were consolidated.

[8] Chang alleged in the alternative that, pursuant to the MOU, he was entitled to a fifteen percent share of the settlement. On appeal, he pursues only his theory as to his alleged fifty percent ownership of WCG.

and their father, Howard, arranged and paid for Mosko to also represent Chang. Chang claimed that, while the Mosko defendants were aware of the MOU between Chang and ConnectU, as well as Chang's partnership in WCG, he and the Mosko defendants never discussed any potential claims he might have against ConnectU or the Winklevoss defendants.

The Mosko defendants' representation of Chang was memorialized in an engagement agreement, signed by Chang on March 1, 2007. The agreement stated in detail that Mosko was concurrently representing the Winklevoss defendants; that the Winklevoss defendants were his "primary client[s]"; and that he agreed to additionally represent Chang "[a]s an accommodation" to the Winklevoss defendants. The agreement further provided that Chang would "waive any current or future conflicts that . . . may exist in the future by [virtue of the Mosko defendants'] representation [of both Chang and the Winklevoss defendants]."

The complaint alleged that while Mosko had informed Chang by e-mail on January 29, 2008, about an upcoming mediation (which Mosko attended), Mosko never provided Chang with any specific information about the date, time, or place of the mediation, or, after the mediation, the terms of the settlement agreement. In the January 29 e-mail, Mosko stated that "[u]nless I hear objection, I will move forward with this

mediation."  On February 25, 2008, Mosko sent Chang a second e-mail informing him that, as a result of the mediation, the parties had reached a global settlement of the Facebook litigation, and stated, "The effect [of the settlement] on you will be a dismissal of the [California action] with prejudice." No other details concerning the terms of the settlement were included.  The terms of the settlement agreement did not specify any particular apportionment of the proceeds among those with an ownership interest in ConnectU.

On April 28, 2008, Mosko sent Chang a third e-mail, which summarized their telephone conversation earlier that day regarding the continuing acrimony between Facebook and the Winklevoss defendants over the settlement.  Mosko's e-mail stated, "We also discussed at least the possibility that . . . you may be in a position to disagree with ConnectU's decision to dispute the enforceability of the settlement agreement.  To the extent there may be a conflict between you and ConnectU, I advised that it might be a good idea for you to get a separate attorney to look at this. . . .  For now, you have told me that you are willing to sit on the side lines without raising a conflict, while ConnectU and Facebook fight this recent battle."

By November of 2008, pursuant to an order of the District Court enforcing the settlement agreement, the proceeds of the settlement were transferred to a special master.  Soon

thereafter, pursuant to an amended judgment ordering specific performance of the settlement agreement, the special master was ordered to transfer Facebook's payment of cash and stock to Boies, Schiller & Flexner LLP (BSF), a law firm representing the Winklevoss defendants and designated to act as trustee of the proceeds.  The court ordered that, upon transfer to BSF, the proceeds were to be held "in trust for [BSF's] clients and any lawful claimant."  A year later, in 2009, Chang filed the complaint in this action.  The settlement proceeds continued to be held in trust until the litigation (including the appeal) over the enforceability of the settlement agreement was resolved in December 2011.  Chang did not file any pleading seeking consideration as a "lawful claimant."[9]

Discussion.  1.  The equitable claims.  a.  The Winklevoss defendants' motion to dismiss and Chang's motion for

_____

[9] We note that additional facts not before the judge, but included in the record, confirm that Chang failed to take any action to assert that he was a lawful claimant.  On November 1, 2011, the District Court ordered all "parties seeking disbursement of funds" to file motions and appear before the court at a hearing to be held on November 28, 2011.  BSF forwarded the order to Chang's then-attorneys (he was no longer represented by the Mosko defendants) and advised them of Chang's options.  On December 5, 2011, the District Court ordered disbursement of the settlement proceeds to the claimants, including the Winklevoss defendants and others.  Chang never filed a claim and therefore was not included in that court's order of disbursement.

reconsideration. We review the allowance of a motion to dismiss pursuant to Mass. R. Civ. P. 12 (b) (6) de novo, accepting the allegations in the complaint as true and drawing all reasonable inferences in the nonmoving party's favor. Curtis v. Herb Chambers I-95, Inc., 458 Mass. 674, 676 (2011). "The ultimate inquiry is whether [Chang] alleged . . . facts . . . so as to plausibly suggest an entitlement to relief" (citation omitted). Baker v. Wilmer Cutler Pickering Hale & Dorr LLP, 91 Mass. App. Ct. 835, 842 (2017).

Relying on MCI WorldCom Communications, Inc. v. Department of Telecommunications & Energy, 442 Mass. 103, 116 (2004), and Fox v. F & J Gattozzi Corp., 41 Mass. App. Ct. 581, 589 (1996), a Superior Court judge (first judge) issued a consolidated order on April 28, 2011, dismissing the quantum meruit and unjust enrichment claims, and stating simply, "Chang has asserted both tort and breach of contract claims which, if the Winklevoss defendants are held liable, will adequately compensate him for any losses." Upon reconsideration, the judge revised his grounds for dismissal, stating that "[t]he court has already determined that the complaint alleges sufficient facts as to the existence of a contract to withstand a motion to dismiss." We interpret the judge's succinct rulings as an application of the well-settled principle that a claim of unjust enrichment or quantum meruit will not lie "where there is a valid contract

that defines the obligations of the parties" (citation omitted). Metropolitan Life Ins. Co. v. Cotter, 464 Mass. 623, 641 (2013) (unjust enrichment). Boston Med. Ctr. Corp. v. Secretary of the Executive Office of Health & Human Servs., 463 Mass. 447, 467 (2012) (quantum meruit).

However, the existence of a contract is a question of fact. LeMaitre v. Massachusetts Turnpike Auth., 70 Mass. App. Ct. 634, 637 (2007). At the pleading stage, that factual question had not been resolved. Although damages for breach of contract and unjust enrichment are mutually exclusive, "it is accepted practice to pursue both theories at the pleading stage." Zelby Holdings, Inc. v. Videogenix, Inc., 92 Mass. App. Ct. 86, 93 (2017), quoting Lass v. Bank of Am., N.A., 695 F.3d 129, 140-141 (1st Cir. 2012).[10] Thus, dismissal of Chang's equitable claims on these grounds at the pleading stage, where the claims were properly pleaded in the alternative, was error, "as it presuppose[d] the existence of a valid underlying contract."

---

[10] Chang properly pleaded an alternative basis for relief pursuant to Mass. R. Civ. P. 8 (e) (2), 365 Mass. 749 (1974), which "permits a party to state as many separate claims or defenses as may be properly available, 'regardless of consistency and whether based on legal or equitable grounds.'" Zelby Holdings, 92 Mass. App. Ct. at 92.

Zelby Holdings, supra.[11]  Upon our de novo review, however, we affirm the dismissal on different grounds.[12]

To prove claims for quantum meruit and unjust enrichment, Chang would be required to demonstrate that he had conferred a measurable benefit on the Winklevoss defendants through the services he rendered and that he had a reasonable expectation of receiving compensation for those services.  See Finard & Co., LLC v. Sitt Asset Mgt., 79 Mass. App. Ct. 226, 229 (2011).  Such compensation is the "fair and reasonable value" of the services provided.  J. A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 797 (1986).  Here, instead of seeking the fair and reasonable value of the services he provided to the Winklevoss defendants during their short collaboration, Chang sought the value of his alleged ownership interest in either ConnectU or WCG, ConnectU's parent company.[13]  Thus, Chang's asserted entitlement to a

---

[11] We need not analyze Chang's quantum meruit and unjust enrichment claims separately as, in this context, these quasi-contract claims are indistinguishable.  See Liss v. Studeny, 450 Mass. 473, 479 (2008).

[12] "We may affirm the judgment on any ground apparent on the record that supports the result reached in the [trial] court" (quotation and citation omitted).  Lopes v. Commonwealth, 442 Mass. 170, 181 (2004).

[13] Chang did not set forth any facts in his complaint regarding the fair and reasonable value of his services beyond a general reliance on his ownership stake in ConnectU and in the partnership, although in an affidavit subsequently submitted he stated that the Winklevoss defendants had paid him a stipend and reimbursed him for certain expenses.

portion of the Facebook litigation settlement proceeds was premised entirely on ownership interest(s) that were contractually created and defined.  As a matter of law, "a party does not recover on the contract itself under quantum meruit [or unjust enrichment]."  Finard, 79 Mass. App. Ct. at 229, quoting Liss v. Studeny, 450 Mass. 473, 480 (2008).  Accordingly, Chang's equitable claims did not provide a legally plausible basis for relief.

b.  Chang's motion to amend the complaint.  After the first judge dismissed the equitable claims, Chang moved to amend his complaint.  The motion was denied by the same judge.  We review the denial of a motion to amend a complaint for abuse of discretion, Nguyen v. Massachusetts Inst. of Tech., 479 Mass. 436, 461 (2018), and Chang has the burden to show that the judge exceeded the bounds of his discretion.  Mancuso v. Kinchla, 60 Mass. App. Ct. 558, 572 (2004).  Although leave to amend should be "freely given when justice so requires," Mass. R. Civ. P. 15 (a), 365 Mass. 761 (1974), such leave may be denied where amending the complaint would be futile.  Nguyen, supra.  An amended complaint is futile if the amended claims would not survive a motion to dismiss for failure to state a claim. Mancuso, supra.

In his motion to amend, Chang sought to add facts showing that, as a result of his work, ConnectU gained more than 20,000 users and was able to obtain and import additional user information. Chang argued that these facts supported his contention that his services provided a benefit to ConnectU. However, the proposed amendments did not set forth any facts relating to the fair and reasonable value of the services Chang rendered, and they did not alter his theory of recovery, which remained grounded in his contract-based ownership interests. For these reasons, we cannot say that the judge "made a clear error of judgment in weighing the factors relevant to the decision . . . such that the decision [that the amended complaint was futile] falls outside the range of reasonable alternatives." L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

2. Chang's partnership claim against the Winklevoss defendants. The Winklevoss defendants subsequently moved for summary judgment on Chang's contract claims. The motion was allowed by a second Superior Court judge. We review the allowance of a motion for summary judgment de novo. Targus Group Int'l, Inc. v. Sherman, 76 Mass. App. Ct. 421, 428 (2010). In doing so, we look to the "same record as the motion judge" and determine "whether the evidence, viewed in the light most favorable to the losing party, establishes all material facts

and entitles the successful party to a judgment as a matter of law."  Id.

While Chang's contract claims encompassed a number of related causes of action, on appeal he argues only that it was error to dismiss his claim that the Winklevoss defendants breached a partnership or joint venture agreement to create WCG, the holding company that was intended to own ConnectU, i2hub, and other ventures, and in which he claims to have had a fifty percent ownership stake (partnership claim).  Pursuant to the partnership claim, Chang asserted an entitlement to fifty percent of the Facebook litigation settlement proceeds.

The second judge concluded that the undisputed material facts established that, while the parties may have entered into some semblance of an oral agreement to form a partnership, "whatever partnership there may have been (if any) was at an end by the mutual agreement of both sides" as of May 25, 2005.  The judge concluded that the undisputed material facts showed that the parting was mutual, as both sides sought to "extract themselves from one another and their shared business venture." We discern no error in the judge's reasoning.

Chang contends that the judge erred by failing to apply the Massachusetts Uniform Partnership Act, G. L. c. 108A (MUPA), governing dissolution of at-will partnerships.  Under MUPA, a partnership will continue to exist until the winding up of its

affairs is concluded.  See G. L. c. 108A, § 30; Loan Modification Group, Inc. v. Reed, 694 F.3d 145, 151 (1st Cir. 2012) (applying Massachusetts law).  "Winding up" is defined as a process occurring between dissolution and termination wherein "work in process is completed, partnership assets are sold, creditors are paid, and the business of the partnership is brought to an orderly close."  Reed, supra, quoting Anastos v. Sable, 443 Mass. 146, 151-152 (2004).  Here, the summary judgment record established that whatever winding up was necessary for this short-lived partnership, the process was complete as of December 2005.

By the end of May 2005, the parties had mutually agreed to dissolve whatever partnership they may have had.  Chang's claim that "[t]here remained ongoing disputes about the finances of the partnership, including the Winklevoss [d]efendants' claim that Chang owed them $18,000, and Chang's claim that the Winklevoss [d]efendants had an ongoing duty to fund his work for the business," is not supported by the summary judgment record. There was no evidence of any effort to follow up on these "disputes" after May 25, 2005.  While there was some suggestion during an online discussion on May 25 of a further conference call, there was no evidence that such a call occurred.  When Chang suggested to Tyler, "Decide what you want to do [and] if you want the integration to go ahead, make an offer," no offer

was forthcoming.  In fact, after May 25, 2005, the parties had almost no contact.[14]  In short, the summary judgment record did not raise a triable issue of fact on these issues.  The winding-up process was complete and the partnership was terminated well before the Winklevoss defendants entered into settlement negotiations with Facebook in February of 2008.

The parties' undisputed words and conduct demonstrate that by at least the end of 2005 they had mutually agreed to rescind any partnership, and that their relationship going forward would be as if no partnership had ever existed, with Chang retaining full control over i2hub and the Winklevoss defendants retaining full control over ConnectU.  "An agreement to rescind a contract need not be made in any formal, express terms.  Rather, mutual assent to a rescission may be inferred from the attendant circumstances and conduct of the parties."  Puma v. Gordon, 9 Mass. App. Ct. 489, 495 (1980).  See Flaherty v. Goldinger, 249 Mass. 564, 567 (1924).  Here, even when the facts are viewed in the light most favorable to Chang, the undisputed evidence established that the parties agreed to take their respective companies and "simply to walk away."  For these reasons, we

---

[14] The record shows only a single e-mail from Cameron to Chang dated December 21, 2005, in which Cameron informed Chang of an outstanding bill of $3,820 owed to the Pioneer Valley Transit Authority for advertisements.  Chang paid the bill.

discern no error in the allowance of the Winklevoss defendants' motion for summary judgment.[15]

3. Legal malpractice claim against the Mosko defendants. To prevail on a claim for legal malpractice, a plaintiff must establish the existence of an attorney-client relationship, a breach of the duty of care, actual damages, and that the breach proximately caused such damages. See Williams v. Ely, 423 Mass. 467, 475-476 (1996). Chang's allegations, taken as true, "must be enough to raise a right to relief above the speculative level." Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "A complaint is insufficient if it rests on 'naked assertions' devoid of 'further factual enhancement.'" Doe v. American Guar. & Liab. Co., 91 Mass. App. Ct. 99, 105 (2017), quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In allowing the motion to dismiss the claims against the Mosko defendants for lack of subject matter jurisdiction pursuant to rule 12 (b) (1), the first judge focused on Chang's failure to demonstrate any cognizable harm he sustained as a result of the Mosko defendants' representation, reasoning that "any injury as a result of missed settlement opportunities is

---

[15] Given the result we reach, we need not address the defenses of repudiation and equitable estoppel raised by the Winklevoss defendants.

far too speculative, and any causal connection to the defendants' conduct far too attenuated, to confer standing." The judge further concluded that "[a]ny claim to the proceeds rests, of necessity, on Chang's claim of ownership rights in ConnectU." The judge added that dismissal was also appropriate under rule 12 (b) (6) for Chang's failure to state a claim.

While we agree that Chang failed to set forth any cognizable harm resulting from professional negligence, we rest our determination on Chang's failure to state a claim under rule 12 (b) (6). On appeal, Chang argues that he was injured by the Mosko defendants' negligence in both failing to adequately protect his interests and in subordinating his interests to those of the Winklevoss defendants during the Facebook litigation mediation. In support thereof, he points to a number of alleged negligent acts, including failing to sufficiently inform him of, or include him in, the Facebook litigation settlement discussions in which he had a direct and substantial interest, thus depriving him of the opportunity to participate so as to obtain a more favorable outcome. Chang further claims that the Mosko defendants agreed to a release of his claims without his authorization, and failed to advise him of both potential conflicts of interest arising from the Mosko defendants' dual representation of him and the Winklevoss

defendants, as well as his right to independent counsel or possible claims against the Winklevoss defendants.

These allegations are either insufficiently supported or contradicted by the evidence relied on or referenced in the complaint. For example, Chang's engagement agreement with the Mosko defendants is contrary to Chang's claim that he was not made aware of any potential conflicts of interest. The agreement expressly stated that Mosko was concurrently representing the Winklevoss defendants, that they were his "primary client[s]," and that Chang was agreeing to "waive any current or future conflicts" stemming from the representation.[16] Chang agreed to the representation on these terms. Pursuant to Mass. R. Prof. C. 1.7 (b), as appearing in 471 Mass. 1335 (2015), a lawyer may represent a client in the face of a possible risk of a conflict of interest as long as the lawyer reasonably believes that the representation will not adversely affect the client and the client gives informed, written consent. Moreover, Chang's complaint noted that he never discussed his ownership interests in ConnectU or WCG with the

---

[16] The engagement agreement was drafted to reflect the original purpose of the representation, which was "solely in connection with a deposition and document subpoena" Chang had received in the California action. The representation continued once Chang was named as a defendant in that action.

Mosko defendants.[17]  Even if the Mosko defendants were aware of Chang's ownership interests in ConnectU and WCG, the representation was limited to defending him against claims of misappropriation of proprietary information and user data brought by Facebook in the California action.  Pursuant to Mass. R. Prof. C. 1.2 (c), as appearing in 471 Mass. 1313 (2015), "[a] lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent."

The e-mails Mosko sent to Chang show that Mosko kept Chang reasonably updated on the negotiations and informed him of relevant details of the settlement -- for example, that the settlement procured a dismissal of Facebook's claims against Chang in the California action.  The e-mails also show that Chang was given ample opportunity to request additional information.  In one e-mail, Mosko advised Chang of potential conflicts of interest arising from the dual representation, as well as Chang's right to independent counsel.

Finally, the terms of the settlement agreement, which are set forth in the District Court's order enforcing the agreement,

---

[17] The complaint alleged only that the Mosko defendants were "aware of" the MOU, "aware of the existence" of WCG, and aware that Chang and the Winklevoss defendants had operated as partners.

did not apportion the proceeds among any of the ConnectU stakeholders. Nor did Chang allege that the Mosko defendants should or could have altered the terms of the agreement to explicitly apportion to Chang any such share. The assertion that the Mosko defendants' negligence caused Chang not to receive his fair portion of the settlement proceeds is further belied by the fact that, at the time Chang filed his complaint and for almost two years thereafter, the settlement proceeds were held in trust as ordered by the court in the California action for "any lawful claimant." Accordingly, Chang's right to a portion of the settlement proceeds, if any, remained intact and was not impaired by any conduct of the Mosko defendants.[18] Chang does not explain his failure to submit a claim to the settlement proceeds.

Simply put, Chang failed to allege facts to plausibly suggest that he "probably would have obtained a better result had the attorney exercised adequate skill and care," as he must to prevail on a professional negligence claim. Fishman v. Brooks, 396 Mass. 643, 647 (1986).[19]

---

[18] Chang claimed that the "any lawful claimant" language was inserted for the specific purpose of allowing the Winklevoss defendants' former counsel to submit a claim for payment of their fees. However, court orders and correspondence between the trustee and Chang's then-attorneys (no longer the Mosko defendants) show that Chang could have, in fact, submitted a claim of entitlement.

_Judgment affirmed._

_Judgment for costs affirmed._

---

[19] "Other points, relied on by [Chang], but not discussed in this opinion, have not been overlooked.  We find nothing in them that requires discussion."  _Commonwealth_ v. _Domanski_, 332 Mass. 66, 78 (1954).